******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* GEORGE
MICHAEL LENIART
(AC 36358)

Sheldon, Prescott and Flynn, Js.

*Argued October 8, 2015—officially released June 14, 2016*

(Appeal from Superior Court, judicial district of New
London, Jongbloed, J.)

*Lauren Weisfeld*, senior assistant public defender,
for the appellant (defendant).

*Stephen M. Carney*, senior assistant state's attorney,
with whom, on the brief, was *Michael L. Regan*, state's
attorney, for the appellee (state).

*Opinion*

PRESCOTT, J. The defendant, George Michael Leniart, appeals from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a (a),[1] and three counts of capital felony in violation of General Statutes (Rev. to 1995) § 53a-54b (5), (7) and (9), as amended by Public Acts 1995, No. 95-16, § 4.[2] The defendant claims that the evidence was insufficient to prove beyond a reasonable doubt each of the crimes of which he was convicted. He also claims that the trial court improperly excluded a videotape of an interview conducted by police of a crucial prosecution witness just prior to the administration of a polygraph examination, admitted evidence of prior misconduct committed by the defendant, and excluded expert testimony that he proffered regarding the lack of reliability of jailhouse informant testimony. Although we disagree with the defendant's claims regarding the sufficiency of the evidence, we agree that the court improperly excluded the polygraph pretest interview videotape, and, accordingly, we reverse the judgment of conviction and remand the case for a new trial. Because the remaining two evidentiary issues are likely to arise again on remand, we address them in turn. Although we disagree with the defendant that the court improperly admitted evidence of his prior misconduct, we agree that the court improperly excluded expert testimony proffered by the defendant regarding the reliability of jailhouse informant testimony.

The jury reasonably could have found the following facts. On May 29, 1996, the victim, A.P.,[3] who was fifteen years old, snuck out of her parents' home to meet P.J. Allain, another teenager, so that they could smoke marijuana, drink alcohol, and have sex. The two teenagers were picked up by the defendant, who at the time was thirty-three years old. They then drove to a secluded location in the woods.

A.P. and Allain drank beer, smoked marijuana, and kissed in the defendant's pickup truck. The defendant took Allain aside and told him that he wanted "to do her" and that he "wanted a body for the altar." The defendant had previously told Allain that he was in a cult.

Allain returned to the truck and told A.P. that she was going to be raped by the defendant. A.P. asked that she have sex only with Allain. Allain then removed her clothes and had sex with her in the truck while the defendant watched through the windshield. After Allain and A.P. finished having sex, the defendant climbed into the truck and sexually assaulted A.P. During the assault, Allain kept his hand on A.P.'s breast but could not look at her because he felt horrible. Afterward, A.P. pretended not to be upset so that the defendant would not harm her further.

The defendant then proceeded to drive the teenagers toward home. The defendant dropped off Allain near his home. After Allain was no longer present, the defendant drove A.P. to an unknown location, where he pretended to run out of gas. The defendant forced A.P. to run into the woods with him, and at times he had to drag her along. The defendant then choked A.P., killed her, and disposed of her body in an unknown location. A.P. was never seen again by anyone despite a nationwide search by law enforcement for many years, and her remains have never been recovered.

The defendant admitted to four individuals, on different occasions, to killing A.P. and/or to disposing of her body: Allain[4] and three inmates—Michael Douton,[5] Zee Ching,[6] and Kenneth Buckingham.[7] The defendant was incarcerated with Douton, Ching, and Buckingham at various times while he was serving a sentence for sexually assaulting K.S., a thirteen year old girl, approximately six months prior to the disappearance of A.P.

A warrant was issued for the defendant's arrest on March 28, 2008, and the defendant was subsequently charged in a substitute, long form information with the following crimes: murder in violation of § 53a-54a; capital felony in violation of § 53a-54b (5) (kidnap-murder); capital felony in violation of § 53a-54b (7) (murder in the course of sexual assault); and capital felony in violation of § 53a-54b (9) (murder of person under age sixteen).

The matter was tried to a jury, *Jongbloed, J.*, presiding. On March 2, 2010, the jury returned a verdict of guilty on all counts. On June 22, 2010, the court merged the verdicts into a single conviction of capital felony and sentenced the defendant to a term of life imprisonment without the possibility of release. This appeal followed. Additional facts and procedural history shall be set forth as necessary to address the claims of the defendant.

I

SUFFICIENCY OF THE EVIDENCE

The defendant first claims that the evidence was insufficient to prove beyond a reasonable doubt any of the charges of which he was convicted. Specifically, the defendant asserts that the evidence was insufficient to establish beyond a reasonable doubt that (1) A.P. is dead, because, pursuant to the corpus delicti rule, the defendant's alleged confessions may not be used as evidence to prove that A.P. is dead in the absence of independent proof of her death; (2) the defendant intended to kill A.P.; (3) he murdered A.P. during the commission of a sexual assault because there was no evidence independent of his confessions that he sexually assaulted A.P.; and (4) he murdered A.P. in the course of a kidnapping or before she could be returned to safety.[8] For the reasons that follow, the defendant cannot prevail on his sufficiency of the evidence claims.

## A

We first turn to the defendant's claim that the evidence was insufficient to prove beyond a reasonable doubt that A.P. is dead because, in his view, the only evidence of A.P.'s death is the testimony of four of the state's witnesses that the defendant separately confessed to each of them that he killed A.P. and disposed of her body. The defendant argues that, under these circumstances, the common-law corpus delicti rule prevents him from being convicted of murder and capital felony solely on the basis of his uncorroborated confessions and in the absence of independent extrinsic evidence of the fact of death of the alleged victim.

In response, the state argues that the evidence is sufficient to prove A.P.'s death beyond a reasonable doubt because (1) the defendant cannot rely on the corpus delicti rule, as he failed to object to the admission of his confessions at trial; and (2), under Connecticut's formulation of the corpus delicti rule, a defendant's confession may be used to prove the corpus delicti, i.e., the death of the victim, as long as there is corroborating evidence that substantially establishes the trustworthiness of the defendant's confession. Such corroborating evidence, the state contends, need not itself independently establish the corpus delicti, may be circumstantial in nature, and need not prove any element of the offense beyond a reasonable doubt.

We reject the defendant's claim that the evidence was insufficient to prove A.P.'s death. We reach this conclusion primarily for two reasons. First, we conclude that under Connecticut law the corpus delicti rule is an evidentiary rule regarding the admissibility of confessions rather than a substantive rule of criminal law to be applied in reviewing the sufficiency of the state's evidence. In this case, the defendant did not object to the admissibility of his confessions at trial and has not challenged their admissibility on appeal.[9] Accordingly, we conclude that because the defendant has not challenged the admission of the confessions, the confessions may be considered by this court in analyzing the sufficiency of the state's evidence without reference to the corpus delicti rule.

Second, we conclude that, even if the defendant is permitted to raise the corpus delicti rule as part of his sufficiency of the evidence claim, the sufficiency claim fails because substantial evidence, circumstantial or otherwise, was admitted at trial to corroborate both the trustworthiness of his confessions and the fact of A.P.'s death. As a result, because the defendant's confessions may be considered by this court in assessing the sufficiency of the evidence, we apply the traditional standard of review in assessing the evidence and conclude that the evidence was sufficient for the jury to conclude beyond a reasonable doubt that A.P. is dead.

We begin our analysis by reviewing the purpose, history, and present scope of the corpus delicti rule in Connecticut. The corpus delicti rule, which is often also referred to as the corroboration rule, exists "to protect against conviction of offenses that have not, in fact, occurred, in other words, to prevent errors in convictions based solely upon untrue confessions to nonexistent crimes." *State* v. *Arnold*, 201 Conn. 276, 287, 514 A.2d 330 (1986). An early version of Connecticut's corroboration rule was extensively discussed in *State* v. *Doucette*, 147 Conn. 95, 98–100, 157 A.2d 487 (1959), overruled in part by *State* v. *Tillman*, 152 Conn. 15, 20, 202 A.2d 494 (1964). The court in *Doucette* described the rule as follows: "[T]he *corpus delicti* [that is, that the crime charged has been committed by someone] cannot be established by the extra-judicial confession of the defendant unsupported by corroborative evidence. . . .

"The Connecticut rule, which we reaffirm, is that, although the confession is evidence tending to prove both the fact that the crime [charged] was committed [by someone, that is, the corpus delicti] and the defendant's agency therein, it is not sufficient of itself to prove the former, and, without evidence [from another source] of facts also tending to prove the corpus delicti, it is not enough to warrant a conviction; and that there must be such extrinsic corroborative evidence as will, when taken in connection with the confession, establish the corpus delicti in the mind of the trier beyond a reasonable doubt. . . . The independent evidence must tend to establish that the crime charged has been committed and must be material and substantial, but need not be such as would establish the corpus delicti beyond a reasonable doubt apart from the confession. . . . Properly this [extrinsic] evidence should be introduced and the court satisfied of its substantial character and sufficiency to render the confession admissible, before the latter is allowed in evidence. *State* v. *LaLouche*, [116 Conn. 691, 695, 166 A. 252 (1933)]." (Citations omitted; emphasis altered; internal quotation marks omitted.) *State* v. *Doucette*, supra, 147 Conn. 98–100. In *Doucette*, the court concluded that the sum total of the evidence presented by the state of the corpus delicti was inadequate to constitute "material and substantial evidence of the corpus delicti under our rule [and we] are therefore constrained to find *error in the admission of* [*the evidence* of the defendant's extra-judicial confession]." (Emphasis added; internal quotation marks omitted.) Id., 106.

In 1964, our Supreme Court in *State* v. *Tillman*, 152 Conn. 15, 18, 202 A.2d 494 (1964), decided that Connecticut's traditional corpus delicti rule needed refinement in part because of "a lack of harmony in the decisions as to the extent and nature of the corroborative or extrinsic evidence required, both as a prerequisite to

the admission of a confession into evidence and as a prerequisite to a conviction where confessions have been introduced." After examining authorities from numerous jurisdictions, the court in *Tillman* concluded that Connecticut's "difficulties in the application of our corroboration rule largely stem from our present definition of corpus delicti and dictate its abandonment." Id., 20. Instead, the court adopted Professor John Henry Wigmore's definition of the corpus delicti as being "the occurrence of the specific kind of loss or injury embraced in the crime charged." Id. Specifically, the court stated that, in a homicide case, "the corpus delicti is the fact of the death, whether or not feloniously caused, of the person whom the accused is charged with having killed or murdered."[10] Id.

The court in *Tillman* also emphasized that although the corroborating evidence must be material and substantial, it may be circumstantial in nature. Id.[11] After applying the new definition of corpus delicti to the corroboration evidence in the case before it, the court in *Tillman* concluded that there "was no error in the admission or use of the confessions." Id., 21.

The next major refinement of Connecticut's corpus delicti rule occurred in *State* v. *Harris*, 215 Conn. 189, 192–97, 575 A.2d 223 (1990). In *Harris*, the defendant was charged with operating a motor vehicle while under the influence of liquor. Id., 190. At trial, the court granted a motion in limine to exclude inculpatory statements made by the defendant because the state had failed to produce material and substantial independent evidence of the corpus delicti. Id., 191. The state appealed.

Our Supreme Court reversed the judgment of the trial court, holding that the corpus delicti rule should not have barred the admission of the defendant's inculpatory statements. Id., 196. In so doing, the court reasoned that the corpus delicti rule as formulated in *State* v. *Tillman*, supra, 152 Conn. 20, which required corroboration of "the specific kind of loss or injury embraced in the crime charged," should not apply in *Harris* because the crime of operating a motor vehicle while under the influence of liquor proscribes only conduct. See *State* v. *Harris*, supra, 215 Conn. 193. The court in *Harris* reasoned that "when the crime charged prohibits certain conduct but does not encompass a specific harm, loss or injury, a different approach to the corpus delicti rule, other than that enunciated in *Tillman*, is required." Id.

Instead of following the traditional rule, the court in *Harris* adopted the formulation of the corroboration rule set forth in *Opper* v. *United States*, 348 U.S. 84, 93, 75 S. Ct. 158, 99 L. Ed. 101 (1954), which held that "the corroborative evidence need not be sufficient, independent of the statements, to establish the corpus delicti. It is [only] necessary, therefore, to require the

Government . . . to establish the trustworthiness of the [defendant's] statement." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Harris*, supra, 215 Conn. 193–94. Thus, "[i]f . . . there is substantial extrinsic evidence tending to demonstrate that the statements of the defendant are true, i.e., trustworthy, the statements are admissible. . . . The corpus delicti of the crime may then be established by the statements of the accused and the extrinsic evidence considered together." (Citation omitted; internal quotation marks omitted.) Id., 195.

Our Supreme Court's last major reformulation of our corroboration rule came in *State* v. *Hafford*, 252 Conn. 274, 746 A.2d 150, cert. denied, 531 U.S. 855, 121 S. Ct. 136, 148 L. Ed. 2d 89 (2000). In *Hafford*, the defendant at trial filed a motion to exclude a portion of his confession in which he stated that he sexually assaulted the victim before murdering her. Id., 314. The trial court, relying on *State* v. *Harris*, supra, 215 Conn. 189, denied the motion, finding that there was sufficient corroborating evidence to establish that the defendant's confession was trustworthy. *State* v. *Hafford*, supra, 314–15.

On appeal, the defendant claimed that, because he was charged with the felony of sexual assault,[12] which requires proof of a specific loss or injury, the trial court improperly applied the version of the corroboration rule set forth in *Harris*. Id., 315. Instead, the defendant argued in *Hafford*, the trial court should have applied the corroboration rule set forth in *State* v. *Tillman*, supra, 152 Conn. 15, and, before admitting the confession, required independent corroborating evidence of the corpus delicti itself, i.e., that the victim was sexually assaulted, rather than evidence that did not relate to the corpus delicti but otherwise corroborated the reliability of the defendant's admission that he sexually assaulted her. *State* v. *Hafford*, supra, 252 Conn. 315.

In rejecting the defendant's claim, our Supreme Court concluded that the same version of the corroboration rule adopted in *Harris* should be extended to all types of crimes, not just those that prohibit conduct and do not require demonstration of a specific loss or injury. Id., 317. In other words, in all criminal cases in which the corroboration rule is raised, the state need only present extrinsic corroborating evidence of the trustworthiness of the defendant's confession and need not offer material and substantial independent evidence of the corpus delicti itself. The court held that as long as a sufficient showing has been made that the confession is trustworthy, the confession itself may be used to meet the state's burden to prove beyond a reasonable doubt the corpus delicti and all elements of the offense.

In a somewhat cryptic footnote, however, the court in *Hafford* provides what can be described as commentary on its newly minted holding, using language that the concurring opinion here appears to construe as

carving out a limited exception for homicide cases. In that footnote, the court stated: "We note, however, that proving the trustworthiness of a defendant's confession to a crime resulting in injury or loss *often* will require evidence of that injury or loss. For example, a confession to a homicide *likely* would not be trustworthy without evidence of the victim's death." (Emphasis added.) Id., 317 n.23.

We have several observations about this footnote. First, by its use of the adverbs "often" and "likely," our Supreme Court appeared to recognize at least the possibility that in some homicide cases, the state could be successful in establishing that a defendant's confession is sufficiently trustworthy without independent, extrinsic evidence of the victim's death. We are unconvinced that the footnote was intended to convey any deviation from the court's holding. Rather, the footnote simply conveyed that in many cases involving an injury or loss, the trustworthiness of the confession might be most easily and sufficiently corroborated through evidence of the corpus delicti itself. That statement, however, does not alter the court's holding that such evidence is no longer mandatory if other sufficient corroborating evidence is available.

Second, unlike the former version of the corroboration rule expressed in *Tillman*, the touchstone of the court's analysis in *Hafford* is the trustworthiness of the confession rather than an evaluation of whether the state has presented independent, material, and substantial evidence of the corpus delicti itself. We do not read the footnote, which contains no analysis, to change that focus.

Third, the footnote is dictum. "Dictum is generally defined as [a]n expression in an opinion which is not necessary to support the decision reached by the court. . . . A statement in an opinion with respect to a matter which is not an issue necessary for decision. . . . Our Supreme Court has instructed that dicta have no precedential value." (Citation omitted; internal quotation marks omitted.) *State* v. *Torres*, 85 Conn. App. 303, 320, 858 A.2d 776, cert. denied, 271 Conn. 947, 861 A.2d 1179 (2004). In *Hafford*, the victim's body was found and thus there was undeniable evidence of the victim's death. As a result, there was no need for the court to opine whether a confession to a homicide may or may not be trustworthy without evidence of the victim's death. Moreover, the footnote has never been relied upon by our Supreme Court or this court. In any event, even if we were to conclude that in homicide cases the trustworthiness of a confession may only be sufficiently established by extrinsic evidence of the victim's death, we conclude, for reasons that we will subsequently discuss at greater length, that the state in this case has offered sufficient independent evidence of A.P.'s death, along with other facts, to establish both the trustworthi-

ness of the defendant's confession and the fact of death.

Having ascertained and articulated the specific version of the corroboration rule that is to be applied, we next turn to the issue of whether Connecticut's corroboration rule is an evidentiary rule that must be raised by objecting to the admission of the defendant's confessions at trial, or whether it is a substantive rule of criminal law that may be raised for the first time after the confessions are introduced, either at trial or in postverdict proceedings, including on appeal.[13] This question is not academic because if the corroboration rule is a substantive rule of criminal law, i.e., an implicit element of the state's case for which there must be sufficient evidence, then the state's failure to establish the corpus delicti could entitle a defendant to a judgment of acquittal. If the corroboration rule is simply an evidentiary rule that prohibits the admission of a defendant's confession until the state has offered material and substantial evidence to establish the trustworthiness of the defendant's confession, then any reversible error by the trial court in applying the rule could only result in a new trial for a defendant rather than a judgment of acquittal. We conclude that Connecticut's corroboration rule is properly understood and applied as an evidentiary rule rather than a substantive rule of criminal law.

We begin our analysis by reviewing Connecticut authority on this point. Prior to 1988, our Supreme Court typically applied the corroboration rule in the context in which the defendant raised it. In other words, if a defendant at trial objected to the admission of his confession on the ground that the state had not satisfied the corpus delicti rule, then, on appeal, our courts treated the claim as an evidentiary issue. See, e.g., *State* v. *Hafford*, supra, 252 Conn. 314 ("The defendant's final claim is that . . . [his] confession was inadmissible under the corpus delicti rule. We disagree."); *State* v. *Tillman*, supra, 152 Conn. 17–21 ("The defendant objected to the admission . . . of each of these confessions on the ground that the state had failed to offer sufficient preliminary proof of the corpus delicti to render any of the confessions admissible . . . . [T]here was no error . . . ." [Citations omitted.]). If, however, the defendant raised the corroboration rule as part of a sufficiency of evidence claim, then our courts reviewed the claim under that rubric. See, e.g., *State* v. *Arnold*, supra, 201 Conn. 286 ("a *naked* extrajudicial confession of guilt by one accused of crime is not sufficient to sustain a conviction when unsupported by *any* corroborative evidence" [emphasis in original; internal quotation marks omitted]).

In 1988, our Supreme Court decided *State* v. *Uretek, Inc.*, 207 Conn. 706, 543 A.2d 709 (1988). In *Uretek, Inc.*, the defendant company and its vice president, John Andrews, were prosecuted for knowingly storing haz-

ardous waste without a permit. Id., 707. At trial, the defendants did not challenge the admission of certain inculpatory extrajudicial statements made by Andrews. Id., 713. On appeal, the defendants challenged the sufficiency of the evidence. Id., 707. As part of their evidentiary sufficiency claims, the defendants contended that the statements made by Andrews could not be considered because the state had failed to present independent evidence to establish the corpus delicti. Id., 713.

Our Supreme Court, however, declined to review the corpus delicti claim because the defendant company had failed to object to the admission of the statements at trial or to move for a judgment of acquittal on the basis of a lack of corpus delicti evidence. Id. The court then stated that it would not review the unpreserved corpus delicti claim because it did "not implicate a fundamental constitutional right" and, thus, did not satisfy the requirements for review of unpreserved claims set forth in *State* v. *Evans*, 165 Conn. 61, 70, 327 A.2d 576 (1973), the precursor to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). *State* v. *Uretek, Inc.*, supra, 207 Conn. 713.

Less than one year later, however, our Supreme Court, in *State* v. *Oliveras*, 210 Conn. 751, 757, 557 A.2d 534 (1989), was again confronted with a sufficiency of the evidence claim that relied upon the corpus delicti rule. At trial, the defendant had failed to object to the admission of his inculpatory statement or raise the corpus delicti rule in his motion for a judgment of acquittal. Although the court recognized that in *State* v. *Uretek, Inc.*, supra, 207 Conn. 713, it had "summarily" declined to review an unpreserved corpus delicti claim because it was not of constitutional magnitude; *State* v. *Oliveras*, supra, 756; the court in *Oliveras* stated that "[w]e need not now decide whether a claim that there was no proof of the corpus delicti . . . from evidence independent of the confession or admissions of an accused would warrant review under *Evans* as implicating a constitutional right." Id., 757.[14] Instead, the court chose to review the unpreserved claim and concluded that there was ample evidence of the victim's death[15] and, therefore, that the defendant's confession could be used to prove the other elements of the offense. Id. In choosing to review the claim, the court did not indicate whether it considered the claim to be unpreserved because the defendant had failed to object to the admission of his confession.

Despite the language in *Oliveras*, this court previously has concluded that it is bound by our Supreme Court's holding in *Uretek, Inc.*, that the corroboration rule is not of constitutional magnitude and, thus, an unpreserved corpus delicti claim founders on the second prong of *Golding*. See *State* v. *Heredia*, 139 Conn. App. 319, 324–25, 55 A.3d 598 (2012), cert. denied, 307

Conn. 952, 58 A.3d 975 (2013). As we stated in *Heredia*, "[o]ur Supreme Court has held that corpus delicti does not implicate a fundamental constitutional right sufficient to satisfy the standard set forth in *Golding*. In *State* v. *Uretek, Inc.*, [supra, 207 Conn. 713], our Supreme Court summarily rejected a claim that the lack of extrinsic corroboration of an admission that was vital to proving an element of the offense implicated a fundamental constitutional right and, therefore, concluded that such a claim did not qualify for review. . . . *State* v. *Oliveras*, [supra, 210 Conn. 756] . . . . Although our Supreme Court in *Oliveras* retreated from the holding in *Uretek, Inc.*, by declining to decide whether [an unpreserved] claim that there was no proof of the corpus delicti . . . would warrant review . . . as implicating a constitutional right; [id., 757]; and this court in *State* v. *McArthur*, [96 Conn. App. 155, 166, 899 A.2d 691, cert. denied, 280 Conn. 908, 907 A.2d 93 (2006)], assume[d] . . . that the defendant's [unpreserved corpus delicti] claim [was] constitutional in nature in order to reach its merits, *Uretek, Inc.*, has not been expressly overruled. . . . Accordingly, we conclude that the defendant has failed to show that his claim is of constitutional magnitude as required by the second *Golding* prong." (Citations omitted; internal quotation marks omitted.) *State* v. *Heredia*, supra, 324–25.[16]

The defendant argues that *Heredia* is wrongly decided and should be overruled because (1) other jurisdictions have given unpreserved corpus delicti claims appellate review, and (2) *Uretek, Inc.*, is not binding authority because our Supreme Court retreated in *Oliveras* from its holding in *Uretek, Inc.* We decline to overrule *Heredia* because "[t]his court's policy dictates that one panel should not, on its own, [overrule] the ruling of a previous panel. The [overruling] may be accomplished only if the appeal is heard en banc." (Internal quotation marks omitted.) *State* v. *Ortiz*, 133 Conn. App. 118, 122, 33 A.3d 862 (2012), aff'd, 312 Conn. 551, 93 A.3d 1128 (2014). Moreover, we agree with this court's conclusion in *Heredia* that because the Supreme Court in *Oliveras* did not overturn its prior decision in *Uretek, Inc.*, this court remains obligated to follow *Uretek, Inc.*

Even if we were to conclude that we are not bound by *Uretek, Inc.*, and thus that the law on this issue remains unsettled in Connecticut, we would still reject the defendant's claim that he is entitled to rely on the corroboration rule on appeal despite his failure to object to the admission of his alleged confessions at trial and his argument that the corroboration rule is a substantive rule of criminal law. The question of whether the corroboration rule is an evidentiary rule or a substantive rule of criminal law has been the subject of significant discussion in other jurisdictions and by commentators. Professor Wayne LaFave aptly

describes this debate as follows: "In its traditional form, the corpus delicti rule may have barred the government from introducing the defendant's confession until it had first proved the corpus delicti. However, it is now generally accepted that a trial judge has the discretion to vary the order of proof, meaning that the government may introduce the defendant's confession before it has introduced the additional evidence that will establish the corpus delicti, so long as the corpus delicti is proved before the government rests. Aside from the order of proof, there is also the question of whether the corpus delicti rule simply defines the evidentiary foundation needed to support the introduction of the defendant's confession, so that the decision is to be made by the trial judge before the case is submitted to the jury, or whether on the other hand it establishes an implicit element of the government's proof, so that the trial judge's evidentiary ruling would be merely preliminary to the jury's later determination of corpus delicti. There is a split of authority between the 'evidentiary foundation' and 'implicit element' approaches, though apparently most courts follow the latter view." (Emphasis omitted; footnotes omitted.) 1 W. LaFave, Substantive Criminal Law (2d Ed. 2003) § 1.4 (b), p. 31; compare, e.g., *Langevin* v. *State*, 258 P.3d 866, 869 (Alaska App. 2011) ("Alaska cases . . . have followed the 'evidentiary foundation' approach to corpus delicti"); *State* v. *Fundalewicz*, 49 A.3d 1277, 1278–79 (Me. 2012) (credible evidence of corpus delicti must be presented before defendant's confession is admissible); *State* v. *Sweat*, 366 N.C. 79, 88, 727 S.E.2d 691 (2012) ("corpus delicti doctrine is a legal question of admissibility"); with *People* v. *LaRosa*, 293 P.3d 567, 578–79 (Colo. 2013) (en banc) (treating corpus delicti doctrine as rule affecting sufficiency of evidence); *State* v. *Reddish*, 181 N.J. 553, 617–19, 859 A.2d 1173 (2004) (reviewing whether trial court properly denied defendant's motion for judgment of acquittal); *Commonwealth* v. *Byrd*, 490 Pa. 544, 556, 417 A.2d 173 (1980) (given limited nature of corpus delicti requirement, state produced sufficient independent evidence to support conviction of robbery, conspiracy). Professor LaFave sides with the evidentiary foundation formulation of the rule.[17] See 1 W. LaFave, supra, p. 31.

Some federal courts have characterized the corroboration rule as a hybrid rule. For example, the United States Court of Appeals for the Seventh Circuit recently stated: "The corroboration principle sometimes comes into play in the trial court's decision to admit the defendant's confession and also if he later challenges the sufficiency of the evidence." *United States* v. *McDowell*, 687 F.3d 904, 912 (7th Cir. 2012); see also *United States* v. *Dickerson*, 163 F.3d 639, 642 (D.C. Cir. 1999) ("[t]o be sure, the corroboration requirement has also been described as a rule governing the sufficiency of the evidence"). Even in those jurisdictions that consider

the corpus delicti rule to be an implicit element of an offense or treat it as a hybrid rule, many courts have concluded that no special instructions to the jury are required. See, e.g., *United States* v. *McDowell*, supra, 912; *United States* v. *Dickerson*, supra, 642–43; *United States* v. *Singleterry*, 29 F.3d 733, 737–38 (1st Cir.), cert. denied, 513 U.S. 1048, 115 S. Ct. 647, 130 L. Ed. 2d 552 (1994).

After an extensive review of the case law and commentary, we conclude, for the following reasons, that Connecticut's version of the corroboration rule is best characterized and applied as an evidentiary rule, under which a trial judge, upon objection, assesses the corroboration evidence offered by the state before deciding whether to admit the defendant's inculpatory statements. First, our Supreme Court has chosen to follow the corroboration rule established for federal courts in *Opper* v. *United States*, supra, 348 U.S. 93. Under the typical application of that rule, the court exercises its traditional evidentiary gatekeeping function by deciding whether the defendant's extrajudicial confession is sufficiently trustworthy before allowing the jury to hear the confession evidence. *State* v. *Harris*, supra, 215 Conn. 194–95. If the defendant's inculpatory statements are admitted by the trial court, the jury typically does not receive any instruction from the court regarding the corroboration rule, but instead simply assesses whether all of the evidence is sufficient to prove the elements of the offense beyond a reasonable doubt. In so doing, the jury accords the defendant's confession whatever evidentiary weight it concludes is appropriate after considering all relevant evidence, including evidence of its trustworthiness.[18] See *Lego* v. *Twomey*, 404 U.S. 477, 486, 92 S. Ct. 619, 30 L. Ed. 2d 618 (1972) ("[j]uries [are] at liberty to disregard confessions that are insufficiently corroborated or otherwise deemed unworthy of belief").

Certainly, if the corroboration rule implicated the sufficiency of the evidence, then the jury would be expected to play some role in its application but, as previously discussed, most courts following the *Opper* rule do not instruct the jury on the corroboration rule. Moreover, in our view, an appellate court reviewing the jury's factual determination of guilt should not apply a sufficiency of the evidence standard that looks at the evidence at trial through a different lens than that used by the jury in deciding whether the evidence established the defendant's guilt beyond a reasonable doubt. Instead, an appellate court should review for error the trial court's gatekeeping determination that the defendant's confessions are sufficiently trustworthy to permit the jury to hear them.

Second, there is no constitutional requirement to have a corroboration rule at all. See, e.g., *United States* v. *Dickerson*, supra, 163 F.3d 643 (corroboration

requirement "stems from a judicially created evidentiary rule"). Indeed, at least one state has chosen to abandon altogether the corroboration rule; see *State* v. *Suriner*, 154 Idaho 81, 87–88, 294 P.3d 1093 (2013); and other jurisdictions, such as Connecticut, have significantly narrowed the rule over time. See *State* v. *Hafford*, supra, 252 Conn. 315–17. If the rule itself is not constitutional in nature and jurisdictions are free to abandon it altogether, then it makes little sense to characterize it as an implicit element of the state's case that is subject to appellate review like all other unpreserved sufficiency of the evidence claims.[19]

Finally, treating the corroboration rule as an implicit element of the offense has been criticized by courts and commentators because it places juries in the difficult position of having to determine whether the state has proven the corpus delicti or otherwise met the corroboration rule after it has heard evidence regarding the defendant's confessions. See, e.g., *Langevin* v. *State*, supra, 258 P.3d 870; 1 W. LaFave, supra, p. 31. As the Alaska Court of Appeals explained in *Langevin* v. *State*, supra, 870: "The implicit element approach to corpus delicti is difficult to reconcile with our law's normal view concerning a jury's ability to dispassionately assess a confession. Confessions can be powerful evidence, and courts have traditionally feared that, once a jury hears the defendant's confession, the jury will be unable to put aside this knowledge.

"One example of the cautious approach taken by courts when faced with admitting defendants' confessions is the *Bruton* rule—the rule that, when two or more defendants are being tried jointly, if one defendant has confessed and has implicated the co-defendants, that confession cannot be admitted unless the confessing defendant takes the stand. [See *Bruton* v. *United States*, 391 U.S. 123, 126, 128–29, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968)] . . . The [United States Supreme] Court concluded that, once the jury heard that one of the defendants had confessed and had implicated one or more co-defendants, the jurors simply could not be trusted to obey an instruction that forbade them from considering that confession when assessing the guilt of the other defendants.

"The implicit element approach to the corpus delicti rule suffers from this same psychological difficulty. Under this approach, if the trial judge rules that the corpus delicti is satisfied, the jury would hear the defendant's confession, only to later be asked to set the confession to one side and determine whether the government's remaining evidence is sufficient to establish the corpus delicti. One might doubt whether jurors, having heard the defendant's confession to a heinous crime, could dispassionately discharge this duty." (Internal quotation marks omitted.)

For these reasons, we conclude that Connecticut's

corroboration rule is a rule of admissibility to be decided by the court. A defendant who fails to challenge the admissibility of the defendant's confession at trial is not entitled to raise the corroboration rule on appeal because (1) the evidentiary claim is not of constitutional magnitude and, thus, cannot meet *Golding*'s second prong; see *State* v. *Uretek, Inc.*, supra, 207 Conn. 713; and (2) the rule does not implicate the sufficiency of the state's evidence.[20] Accordingly, because the defendant did not object to the admission of the confessions, he is not entitled to raise the corroboration rule on appeal, and, thus, the confessions are substantive evidence that can be used in analyzing his sufficiency of the evidence claims.

We turn, then, to the defendant's claim that the evidence was insufficient to prove beyond a reasonable doubt that A.P. is dead. We begin our analysis by setting forth the traditional standard of review applicable to a sufficiency of the evidence claim. It is well settled that a defendant who "asserts an insufficiency of the evidence claim bears an arduous burden." (Internal quotation marks omitted.) *State* v. *Rodriguez*, 146 Conn. App. 99, 110, 75 A.3d 798, cert. denied, 310 Conn. 948, 80 A.3d 906 (2013). "[F]or the purposes of sufficiency review . . . we review the sufficiency of the evidence as the case was tried . . . . [A] claim of insufficiency of the evidence must be tested by reviewing no less than, and no more than, the evidence introduced at trial." (Internal quotation marks omitted.) *State* v. *Nasheed*, 121 Conn. App. 672, 682, 997 A.2d 623, cert. denied, 298 Conn. 902, 3 A.3d 73 (2010). "In reviewing a sufficiency of the evidence claim, we apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt . . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict." (Internal quotation marks omitted.) *State* v. *Allan*, 311 Conn. 1, 25, 83 A.3d 326 (2014).

"[T]he jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Moreover, it does not diminish the probative force

of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact . . . but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [jury] is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [jury] may draw whatever inferences from the evidence or facts established by the evidence [that] it deems to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *Papandrea*, 302 Conn. 340, 348–49, 26 A.3d 75 (2011).

Finally, on appeal, we do not "ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Internal quotation marks omitted.) *State* v. *Stephen J. R.*, 309 Conn. 586, 594, 72 A.3d 379 (2013).

In this case, there is ample evidence from which the jury reasonably could have concluded beyond a reasonable doubt that A.P. is dead. First, the defendant admitted to Allain on the day following her disappearance that he had choked A.P. to death and disposed of her corpse in a body of water. This admission, for the reasons discussed previously in this opinion, may be used as substantive evidence that she is dead. Similarly, the defendant told Douton, a fellow inmate, that "she was in the river" and that "they would never convict him because they would never find [her] body." The defendant also told his cellmate, Ching, about a teenage girl whom he had raped and killed on his boat before disposing of her body by hiding it in a well and later dumping it in Long Island Sound. In the same vein, but on a different occasion, he told another inmate, Buckingham, that he had accidently choked a young girl to death while having sex with her and "disposed of her off of a boat that he had or had access to out in the Sound." Although these confessions certainly differed from one another in certain respects, the core facts admitted in them were the same: that he killed A.P. by choking her, then disposed of her remains in a body of water.

Additionally, there is evidence independent of the defendant's confessions from which the jury could infer that A.P. is dead. For example, A.P. disappeared during the evening hours from her house never to be seen again despite a nationwide search for her. She had been missing for more than thirteen years at the time of the defendant's trial. She left home that evening without taking money, clothes, or other personal belongings. She was fifteen years old at the time, and the jury could infer from her age and from other evidence of her mental state and maturity that she lacked the intellectual ability and life skills that would equip her with

the necessary resources to live elsewhere, undiscovered by law enforcement and her family. See *People* v. *Ruiz*, 44 Cal. 3d 589, 610–11, 749 P.2d 854, 244 Cal. Rptr. 200 (although victim's body never found, ample circumstantial evidence of her death by foul play included her abrupt disappearance, her failure to contact friends and relatives, and her abandonment of personal effects), cert. denied, 488 U.S. 871, 109 S. Ct. 186, 102 L. Ed. 2d 155 (1988).

Moreover, on the basis of the eyewitness testimony of Allain, the jury reasonably could have concluded that, on the night of her disappearance, the defendant sexually assaulted A.P. in his truck and could have inferred that the defendant, who then had a motive to kill her to avoid criminal liability for the sexual assault, also had the opportunity to kill her as the last person to be seen with her when she was alive.

The jury was also free to credit Allain's testimony that the defendant had stated to him while A.P. was still in his truck and before he sexually assaulted her that he was planning to kill her when he stated that he "wanted to do her" and that "we need a body."[21] This evidence may be used as substantive evidence that the defendant followed through on his plan. "[A] declaration indicating a present intention to do a particular act in the immediate future, made in apparent good faith and not for self-serving purposes, is admissible to prove that the act was in fact performed." (Internal quotation marks omitted.) *State* v. *Farnum*, 275 Conn. 26, 35, 878 A.2d 1095 (2005); Conn. Code Evid. § 8-3 (4).

Finally, the jury reasonably could have inferred that the defendant choked A.P. to death because approximately six months prior to A.P.'s disappearance, the defendant choked another girl, thirteen year old K.S., into unconsciousness during a violent sexual assault. See *State* v. *DeJesus*, 288 Conn. 418, 473, 953 A.2d 45 (2008) (evidence of prior sexual misconduct admissible to establish defendant's "propensity or a tendency to engage in the type of aberrant and compulsive criminal sexual behavior with which he or she is charged"); see also *State* v. *Smith*, 313 Conn. 325, 331–43, 96 A.3d 1238 (2014) (prior misconduct evidence that defendant sexually assaulted and choked third party admissible to demonstrate he choked and murdered victim during commission of sexual assault).[22]

The defendant argues in his brief that there was some evidence before the jury that A.P. was still alive. In particular, the defendant points to a sworn statement, admitted at trial, given to the police by James Butler, a former Marine and a friend of A.P. and her family. In his statement, Butler claimed to have seen and spoken with A.P. in Virginia Beach, Virginia, after her disappearance. Butler was not called to testify at trial, however, and the police were unable to verify any of the details he supplied as to his claimed encounter with A.P. In

any event, the jury certainly was free to disbelieve this evidence because it was largely dependent on hearsay and unsupported by any other evidence. In reviewing a sufficiency of the evidence claim, "we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [trier's judgment] of guilty." (Internal quotation marks omitted.) *State* v. *Brown*, 90 Conn. App. 835, 839, 879 A.2d 466, cert. denied, 276 Conn. 901, 884 A.2d 1026 (2005).

In light of all of the evidence, including all of the reasonable inferences to be drawn therefrom, the fact that law enforcement failed to find her body or discover other forensic evidence that she is dead did not require the jury to conclude that the state failed to meet its burden to prove that A.P. is dead. See, e.g., *State* v. *Estrella*, 277 Conn. 458, 465, 893 A.2d 348 (2006) (upholding conviction despite lack of body and any physical or forensic evidence of death); see also annot., 65 A.L.R.6th 359, 371, § 2 (2011) ("it has long been established and is almost universally recognized that the existence of a body is not necessary for a homicide conviction to be sustained").

Moreover, even if the defendant is entitled to rely on the corroboration rule as part of our review of the sufficiency of the evidence, we would still conclude that independent evidence substantially corroborates the trustworthiness of his confessions.[23] As noted previously, under *Opper* and its progeny, the corroboration evidence (1) may be circumstantial, (2) need not rise to the level of proof beyond a reasonable doubt, and (3) need not independently establish the death of A.P. See *State* v. *Harris*, supra, 215 Conn. 194–95. The evidence previously discussed substantially corroborates the trustworthiness of the defendant's confessions that he acted in accordance with his intention to kill A.P., as expressed to Allain. There is direct eyewitness testimony that he sexually assaulted A.P. on the night of her disappearance. He had a motive to kill her. The behavior to which he confessed, i.e., having sex with and choking a young lady victim under sixteen years of age, is consistent with his behavior in doing the same to K.S. All of this evidence leads to the inevitable conclusion that there was sufficient evidence from which the jury reasonably could have concluded that there was substantial evidence to corroborate the trustworthiness of the defendant's confessions.

Finally, even if footnote 23 in *Hafford* required the state to offer substantial evidence of A.P.'s death that is totally independent of the defendant's confessions, we would still conclude that the state has met this burden. On the basis of the conduct and statements of the defendant during the evening hours of May 29, 1996, and the other circumstances regarding A.P.'s abrupt

disappearance, all of which was supported by testimony and facts independent from his confessions, there was substantial circumstantial evidence from which the jury could conclude that A.P. is dead. Under any version of the corroboration rule, this evidence alone need not establish the death of the victim beyond a reasonable doubt, provided that this evidence and the defendant's confessions together constitute sufficient evidence from which the jury could find beyond a reasonable doubt that A.P. is dead. We conclude that the state met that burden.

B

We next turn to the defendant's claim that the evidence was insufficient to prove beyond a reasonable doubt that the defendant intended to cause the death of A.P. Specifically, the defendant argues that the evidence was sufficient at best to demonstrate an accidental homicide, but falls short of establishing intent to kill. We disagree.

"[T]he specific intent to kill is an essential element of the crime of murder. To act intentionally, the defendant must have had the conscious objective to cause the death of the victim. . . . Because direct evidence of the accused's state of mind is rarely available . . . intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom. . . . Intent to cause death may be inferred from . . . the events leading to and immediately following the death. . . . Furthermore, it is a permissible, albeit not a necessary or mandatory, inference that a defendant intended the natural consequences of his voluntary conduct. . . . In addition, intent to kill may be inferred from evidence that the defendant had a motive to kill." (Internal quotation marks omitted.) *State* v. *Otto*, 305 Conn. 51, 66–67, 43 A.3d 629 (2012). We recognize that a jury may not properly infer an intent to "commit murder from the mere fact of the death of the victim, [or] even from her death at the hands of the defendant." *State* v. *Crafts*, 226 Conn. 237, 248, 627 A.2d 877 (1993).

The following evidence, and the reasonable inferences to be drawn therefrom, was sufficient to demonstrate beyond a reasonable doubt that the defendant intended to cause A.P.'s death. First, although A.P.'s body was never found, the defendant has repeatedly admitted[24] that he choked the victim. From this fact, the jury could infer that he intended her death as a natural consequence of that voluntary act. Although such conduct may also be probative of a lesser mental state, such as recklessness, it is not unreasonable to infer that he intended A.P.'s death by choking her.

Second, the defendant expressed to Allain before A.P.'s death that he intended to kill her. As previously discussed, "[A] declaration indicating a present inten-

tion to do a particular act in the immediate future, made in apparent good faith and not for self-serving purposes, is admissible to prove that the act was in fact performed." (Internal quotation marks omitted.) *State* v. *Farnum*, supra, 275 Conn. 35. This same principle is relevant to whether the defendant committed that act consistent with his stated contention.

Third, the defendant failed to obtain, or to try to obtain, medical assistance for A.P. for the injuries he caused to her. This failure supports an "antecedent intent to cause death." *State* v. *Sivri*, 231 Conn. 115, 129, 646 A.2d 169 (1994); see also *State* v. *Francis*, 228 Conn. 118, 128–29, 635 A.2d 762 (1993) (evidence that defendant stabbed victim and immediately left scene without rendering assistance was sufficient to infer intent); *State* v. *Greenfield*, 228 Conn. 62, 78, 634 A.2d 879 (1993) (victim found "bloodied, unconscious, his forehead visibly compressed, outside his blood-soaked apartment" with "not the slightest evidence that the defendant made any attempt to help the victim" was sufficient evidence to infer intent).

Fourth, the defendant disposed of the victim's body so that it could not be located. Concealing a victim's corpse is "strong evidence of the defendant's consciousness of guilt," and such evidence may be considered "as part of the evidence from which a jury may draw an inference of an intent to kill." *State* v. *Sivri*, supra, 231 Conn. 130 (defendant took extraordinarily successful measures to hide victim's body).

Finally, the state presented strong evidence of the defendant's motive to kill the victim, namely, that the defendant had sexually assaulted A.P. and, therefore, had an interest in ensuring that she could never testify against him.[25] From this evidence, the jury reasonably could have inferred that the defendant had a motive to kill the victim, which the jury could have considered when evaluating the defendant's intent. "Although motive is not an element of the crime of murder that the state must prove beyond a reasonable doubt . . . an intent to kill may be inferred from evidence that the defendant had motive to kill." (Internal quotation marks omitted.) *State* v. *Otto*, supra, 305 Conn. 73–74.

In the present case, the defendant's intent, as an element of the crime of murder, was proven beyond a reasonable doubt by the cumulative impact of the evidence and the rational inferences permissibly drawn therefrom. Accordingly, the defendant cannot prevail on this claim.

C

The defendant also claims, with respect to the crime of capital felony in violation of § 53a-54b (7), that the evidence was insufficient to prove beyond a reasonable doubt that A.P. was murdered in the course of the commission of a sexual assault. The defendant's entire

argument with respect to this claim is contained in one paragraph of his principal brief and is premised on his contention that the only evidence that he murdered A.P. in the course of the commission of a sexual assault came from informants and was supported by no other evidence of a sexual assault.[26] We reject this claim for several reasons.

First, as we have concluded in part I A of this opinion, the defendant did not object to the admission of his confessions and is not entitled to *Golding* review that the confessions were improperly admitted. Moreover, even if the defendant was entitled to raise the corroboration rule on appeal, we have already concluded that the trustworthiness of his confessions was sufficiently corroborated. Finally, the defendant does not contend that the confessions (if properly admitted) and other evidence in the case were insufficient to prove this capital felony count beyond a reasonable doubt. Accordingly, we are not persuaded by the defendant's claim that the evidence was insufficient to prove that the defendant committed murder in the commission of a sexual assault.

D

The defendant next claims that the evidence was insufficient to prove that he is guilty of capital felony in violation of § 53a-54b (5), as alleged in count one of the information, because the state failed to demonstrate beyond a reasonable doubt that he murdered A.P. during the course of a kidnapping or before she was able to return to safety.[27] We disagree.

General Statutes (Rev. to 1995) § 53a-54b (5), as amended by Public Act 95-16, § 4, defines the capital offense of kidnap-murder as "murder by a kidnapper of a kidnapped person during the course of the kidnapping or before such person is able to return or be returned to safety . . . ." In *State* v. *Salamon*, 287 Conn. 509, 542, 949 A.2d 1092 (2008), our Supreme Court "reconsidered its prior interpretation and construction of the kidnapping statutes and concluded that [o]ur legislature . . . intended to exclude from the scope of the more serious crime of kidnapping and its accompanying severe penalties those confinements or movements of a victim that are merely incidental to and necessary for the commission of another crime against that victim. Stated otherwise, to commit a kidnapping in conjunction with another crime, a defendant must intend to prevent the victim's liberation for a longer period of time or to a greater degree than that which is necessary to commit the other crime.

"Although [the] holding in *Salamon* constituted a significant change with respect to our interpretation of the kidnapping statutes, we emphasized that [o]ur holding does not represent a complete refutation of the principles established by our prior kidnapping jurispru-

dence. First, in order to establish a kidnapping, the state is not required to establish any minimum period of confinement or degree of movement. When that confinement or movement is merely incidental to the commission of another crime, however, the confinement or movement must have exceeded that which was necessary to commit the other crime. [T]he guiding principle is whether the [confinement or movement] was so much the part of another substantive crime that the substantive crime could not have been committed without such acts . . . . In other words, the test . . . to determine whether [the] confinements or movements involved [were] such that kidnapping may also be charged and prosecuted when an offense separate from kidnapping has occurred asks whether the confinement, movement, or detention was merely incidental to the accompanying felony or whether it was significant enough, in and of itself, to warrant independent prosecution." (Internal quotation marks omitted.) *State* v. *O'Brien-Veader*, 318 Conn. 514, 557–59, 122 A.3d 555 (2015).

In the present case, the defendant's admissions to Allain regarding his conduct on May 29, 1996, toward A.P. after Allain exited the defendant's vehicle and the defendant drove away with A.P. were sufficient to establish beyond a reasonable doubt that the defendant murdered A.P. during the course of a kidnapping or before she was able to return to safety. The defendant confessed to Allain that he pretended to run out of gas, and that A.P. was "freaking out, saying she had to go home." The defendant stated to Allain that he then dragged A.P. into the woods, "made her run with him" and choked her because she was "freaking out." According to Allain, the defendant also admitted that he tied A.P. to a tree.

On the basis of the defendant's admissions and the reasonable inferences that they support, we conclude that the evidence was sufficient to demonstrate that the defendant's movement and confinement of A.P. was not merely incidental to the crime of murder because he engaged in conduct beyond that necessary to choke the victim to death. Specifically, in a series of events, the defendant prevented A.P. from returning to safety and dragged her by force into the woods and tied her to a tree. The jury was free to infer that these events were protracted and occurred along a series of independent locations. See *State* v. *Ward*, 306 Conn. 718, 736–39, 51 A.3d 970 (2012) (sufficient evidence of kidnapping where defendant dragged victim from kitchen to bedroom and moved her from bed to floor for sexual assault because that act made victim's "possibility of escape even more remote," and sexual assault was brief part of entire fifteen minute encounter); *State* v. *Salamon*, supra, 287 Conn. 549–50 (sufficient evidence of kidnapping because, in addition to assaultive acts, defendant subdued victim and held her down for at least five minutes). Accordingly, we conclude that the jury's ver-

dict that the defendant committed a kidnapping was supported by sufficient evidence.

## II

### EXCLUSION OF VIDEOTAPE OF INTERVIEW

We next turn to the defendant's claim that the court improperly excluded from evidence a videotape of an interview that the police conducted of Allain immediately prior to his taking a polygraph examination (pretest interview). The defendant argues that the court abused its discretion by excluding the videotape of the pretest interview because the videotape contained relevant evidence of Allain's bias and motive for testifying for the state.[28] The state argues that the pretest interview was an inseverable component of the polygraph examination, and, therefore, the court properly excluded the videotape in accordance with our Supreme Court's holding in *State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997) (en banc), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998), in which the court, inter alia, reaffirmed Connecticut's per se ban on the admissibility of "polygraph evidence." We disagree that the videotape of the pretest interview is "polygraph evidence," as that term was used by the court in *Porter*, and we agree with the defendant that, by excluding the tape on that basis, the court improperly excluded relevant evidence of bias. We further conclude, contrary to the state's position, that because the evidentiary error pertained to the veracity of a crucial state's witness, it was harmful and, therefore, constituted reversible error.

The following additional facts, as established by the record and procedural history, are relevant to the defendant's claim. In August, 2004, Allain, who already had provided the police with a written statement implicating the defendant in the murder of A.P., made himself available for a polygraph examination conducted by the state police. Immediately prior to the administration of the polygraph examination, Allain was subjected to an approximately ninety minute pretest interview that was conducted by the polygraph examiner, state police Trooper Tim Madden. Allain was alone with Madden for the majority of the pretest interview, although, at one point, officers who had taken Allain's earlier written statement were brought in to allow Allain to amend that statement. Although Madden informed Allain of his right to have counsel available, Allain never requested access to a lawyer.[29] The pretest interview was videotaped, as was the polygraph examination itself.[30]

At the outset of the interview, Allain repeatedly made clear that he was motivated to take the test because he recently had been charged with violating his probation and had a suspended period of incarceration hanging over his head. Allain told Madden that his probation officer was "pushing toward violating me if I don't take

[the polygraph test]." Although Madden attempted to persuade Allain that there were other and perhaps better reasons why he should take the test, the videotape of the interview plainly demonstrates the pressure Allain felt to take the test.

During the pretest interview, Madden stressed to Allain several times that the police wanted Allain "on their team." He suggested to Allain that the goal of the polygraph was to help Allain give a truthful and consistent statement at trial so that they could "get" the defendant, whom Madden described as the "big fish." Madden said he wanted Allain to pass the polygraph test because it would ensure that he would be a more reliable witness for the state against the defendant. Madden reviewed Allain's prior sworn statement with Allain in detail, and several times expressed his desire that Allain "confirm" his prior statement. On more than one occasion, Madden stopped to point out weak spots in Allain's narrative and arguably attempted to shape Allain's future testimony by suggesting ways in which his statement could be amended to make it more believable.

Madden also repeatedly indicated that it was in Allain's best interest to cooperate with the state, and made clear to Allain that if he failed to cooperate fully, he risked being charged in this matter, something that Allain thus far had avoided. Several times during the pretest interview, Madden offered Allain assurances that even if he were to admit to more substantial involvement in A.P.'s disappearance and murder than previously disclosed, things would go better for Allain if he cooperated fully with the state. To illustrate this point, on at least six different occasions during the pretest interview, Madden and the officers who took his amended statement told Allain about the well-publicized Maryann Measles case, in which a number of persons had been implicated in the horrific rape and murder of a teenage girl in Litchfield County.[31] As it was explained to Allain, one of the participants in the Measles murder (Maggie Bennett), who had cooperated fully with the state, had "gotten off lightly," and received a "slap on the wrist," whereas those who had lied or had been uncooperative with the police and prosecutors received harsh punishments.

The defendant contends, on the basis of a report disclosed to the defense by the state, that Allain failed the polygraph examination. Although the state conceded that the report contained a preliminary conclusion that some of Allain's answers were consistent with deception, the state argued that it would have had to conduct additional testing to determine whether Allain actually failed the polygraph test. There is no evidence that the state performed such testing despite the officers' representations to Allain that the test would definitively determine if he was telling the truth, and thus he

must take and pass it before he would be permitted to testify and become eligible for favorable treatment in connection with A.P.'s rape, disappearance, and death.

Prior to trial, the state filed a motion in limine seeking to exclude all testimony or evidence pertaining to the polygraph examinations of any witnesses. The court first took up the motion in limine at a hearing on February 8, 2010. At that time, defense counsel indicated his opposition to the motion, stating that it was his intention to have the videotape of Allain's pretest interview admitted into evidence along with the results of the polygraph test. With respect to the videotape of the pretest interview, the defendant stated that he would seek to offer it on the ground that it showed Madden giving Allain numerous assurances that Allain would receive favorable treatment if he cooperated,[32] which defense counsel argued "raises questions in my mind about whether this young man is coming into this courtroom with the intention to do anything other than save himself." With respect to the polygraph results, defense counsel argued that Allain had failed the polygraph with respect to questions about whether he had killed A.P. or seen her body after she was dead, and the defendant sought to offer those results not for their truth but for the limited purpose of showing Allain's motivation to fabricate or tailor his trial testimony in order to curry favor from the state. According to defense counsel, because Allain failed the polygraph, he likely was motivated more than ever to convince the state that the defendant was the sole guilty party and that he had nothing to do with A.P.'s murder. Defense counsel stated to the court: "I understand the general rule against the admissibility of polygraph exams and would contend that if the finder of fact were made available of the results, it do so with a limiting instruction that [Allain's] credibility is for them to determine."

The state took the position that none of the evidence that the defense sought to present to the jury regarding the polygraph examination was admissible under applicable law as set forth in *State* v. *Porter*, supra, 241 Conn. 57. The state argued that, as with any witness, the defendant could question Allain about whether his testimony was the result of coercion or assurances from the state. The state also argued that the defendant could call Madden to testify. The state nonetheless agreed with the defendant that the court needed to review the pretest videotape prior to ruling on the motion in limine. The court agreed and passed on ruling on the motion until after it had viewed the videotapes.

On February 11, 2010, the day that Allain was scheduled to testify, the court returned to the issue of the polygraph examination and the videotape evidence, having had an opportunity to review the videotapes of the pretest and the examination itself. The court heard additional arguments from the defense and the state,

each of which essentially reasserted the arguments made at the prior hearing. The state's position remained that the videotape of the pretest interview, like the polygraph results themselves, was "polygraph evidence" as that term was used by our Supreme Court in *Porter* in reaffirming "our per se rule against the use of polygraph evidence in Connecticut courts." *State* v. *Porter*, supra, 241 Conn. 115. The defense countered that, at least with respect to the admission of the videotape of the pretest, this did not present a *Porter* issue because the *Porter* holding was limited to the scientific reliability and admissibility of polygraph results, and because the court in *Porter* never considered or addressed whether the existing bar should extend to any reference to the term polygraph or to other types of evidence related to the administration of polygraph tests.

In an oral ruling following argument, the court refused to admit the videotape as evidence at trial. The trial court appears to have agreed with the state's position that the videotape constituted inadmissible polygraph evidence, reasoning as follows: "Well, I guess in part it depends on how you define the phrase polygraph evidence, but *Porter* does indicate and I quote that: Polygraph evidence should remain per se inadmissible in all trial court proceedings in which the rules of evidence apply, and for all trial purposes, in Connecticut courts. [See id., 94.]

"There's specific reference in footnote 37 [of *Porter*] which addresses the issue of using a polygraph. I'll quote from the footnote: Some jurisdictions that bar the admission of polygraph evidence for the substantive truth of the matter asserted do allow it to corroborate or impeach a witness' testimony. We see no reason for this distinction. [See id., 94 n.37.]

"So, *I'm going to prohibit the use of the reference to polygraph.* But as the state has indicated, there's certainly no prohibition against . . . asking the witness questions on cross-examination that would get to any promises or benefits that were made to him during the course of that interview." (Citations added; emphasis added.) We construe the court's ruling as barring any use of the videotape by the defendant and precluding him from mentioning the term "polygraph" for any purpose.[33]

It is axiomatic that "[w]e review the trial court's decision to admit [or to exclude] evidence, if premised on a correct view of the law . . . for an abuse of discretion." *State* v. *Saucier*, 283 Conn. 207, 218, 926 A.2d 633 (2007). Section 6-5 of the Connecticut Code of Evidence provides: "The credibility of a witness may be impeached by evidence showing bias for, prejudice against, or interest in any person or matter that might cause the person to testify falsely." As indicated in the official commentary to § 6-5, "[b]ecause evidence

tending to show a witness' bias, prejudice or interest is never collateral . . . impeachment of a witness on these matters may be accomplished through the introduction of extrinsic evidence, in addition to examining the witness directly. . . . The scope and extent of proof through the use of extrinsic evidence is subject to the court's discretion . . . ." (Citations omitted.) See *State* v. *Colton*, 227 Conn. 231, 248, 630 A.2d 577 (1993) ("Evidence tending to show the motive, bias or interest of an important witness is never collateral or irrelevant. It may be . . . the very key to an intelligent appraisal of the testimony of the [witness]." [Internal quotation marks omitted.]).

The defendant claims that the court's decision to exclude the videotape of the pretest interview was premised, not on the court's independent assessment as to the probative value of the videotape as evidence of bias weighed against its prejudicial impact, but on an incorrect view of the law, namely, a misunderstanding or misinterpretation of our Supreme Court's holding in *State* v. *Porter*, supra, 241 Conn. 57. Whether the trial court's decision was mandated by *Porter* presents a question of law over which our review is plenary. See *State* v. *Foster*, 293 Conn. 327, 334, 977 A.2d 199 (2009).

In *Porter*, our Supreme Court considered whether Connecticut should adopt the standard announced by the United States Supreme Court in *Daubert*[34] for evaluating the admissibility of scientific evidence, and "whether Connecticut should abandon its traditional per se rule that polygraph evidence is inadmissible at trial"; *State* v. *Porter*, supra, 241 Conn. 58; which the defendant in *Porter* argued was inconsistent with the *Daubert* standard. Id., 93. After an extensive discussion, the court adopted the *Daubert* standard.

The court then turned to the polygraph issue. For purposes of its analysis, the court assumed without deciding that "polygraph evidence" would satisfy the admissibility threshold established by *Daubert*, ultimately concluding, however, that the prejudicial impact of "polygraph evidence" greatly exceeds its probative value. On the basis of that conclusion, the court reaffirmed our per se rule against the admissibility of such evidence "in all trial proceedings in which the rules of evidence apply, and for all trial purposes." Id.

We are unconvinced that the videotape of the pretest interview falls within the scope of the exclusionary rule discussed in *Porter*. Although the court in *Porter* used the term "polygraph evidence" throughout the opinion, a term that, at first blush, seems to be rather broad in scope, it is easily gleaned from the decision that the term was not intended to have an expansive meaning or to encompass any and all evidence tangential to or referring to a polygraph examination. First, as the court indicated, the issue before it was whether to abandon

the existing rule regarding the inadmissibility of the results of polygraph tests. The court gave no indication that it was considering whether to expand the scope of that exclusion, only whether the rule should be maintained in its present iteration. Second, in identifying the rule at issue, the court clearly set forth the scope of the rule as follows: "This court has repeatedly held that neither the *results of a polygraph test* nor the *willingness of a witness to take such a test* is admissible in Connecticut courts." (Emphasis added; internal quotation marks omitted.) *State* v. *Porter,* supra, 241 Conn. 93; accord *State* v. *Duntz,* 223 Conn. 207, 238, 613 A.2d 224 (1992) ("[d]ue to the questionable accuracy of *the results of polygraph examinations*, this court has consistently held that *they* are not admissible either for substantive or impeachment purposes" [emphasis added]); *State* v. *Plourde,* 208 Conn. 455, 471, 545 A.2d 1071 (1988) ("evidence of the *defendant's willingness to take a polygraph test,* which the defendant proffered to rehabilitate her credibility, was properly excluded because of the almost complete lack of probative value [of such consent] and because of its self-serving character" [emphasis added; internal quotation marks omitted]), cert. denied, 488 U.S. 1034, 109 S. Ct. 847, 102 L. Ed. 2d 979 (1989). Thus, because the existing rule under consideration in *Porter* was a per se prohibition against the use of polygraph results or evidence of a witness' willingness to take a polygraph test—usually the defendant—we construe the *Porter* court's use of the term "polygraph evidence" as a shorthand reference to those two specific types of evidence, which were the only evidence associated with the rule of admissibility under review.

We are aware of no other appellate decision in which our courts have been asked to directly address whether a videotape of a pretest interview constitutes excludable polygraph evidence. However, we note that in *State* v. *Davis,* 135 Conn. App. 385, 42 A.3d 446, cert. denied, 305 Conn. 916, 46 A.3d 171 (2012), this court was asked to consider whether the trial court had properly denied a defendant's motion for a continuance prompted by the state's late disclosure of inculpatory statements made during a polygraph pretest interview. In concluding that the defense had not been unfairly surprised by the evidence because the defendant was aware of the videotape of the pretest interview and had asked the state about it prior to trial, this court rejected the defendant's argument that "he believed that the tape was unusable as evidence," noting: "there is no reason that the substance of the statements made by the defendant during that interview would not have been admissible evidence at trial." Id., 401. This is consistent with our view that the videotape of Allain's pretest interview is not per se excludable polygraph evidence under *Porter.*

In the present case, use of the videotape of the pretest interview to demonstrate motive, bias, or interest would

not have revealed the results of Allain's polygraph test nor was it being offered as evidence of Allain's willingness to take a polygraph examination. The state never advanced either ground in support of excluding the videotape from evidence. The videotape of the pretest interview was not "polygraph evidence" and, accordingly, did not fall within the scope of the per se exclusionary rule reaffirmed by the court in *Porter*. Additionally, nothing in the *Porter* decision, or in any other case law of which we are aware, countenances the trial court's decision to preclude all evidentiary references to the term "polygraph" itself.[35] It was not necessary for the court to preclude from evidence the mere fact that a polygraph examination had occurred. As we have already stated, the court needed only to guard against the admission of the results of a polygraph examination or of the examinee's willingness to take such an examination as evidence at trial.[36] Indeed, to the extent that the court was concerned that the jury would draw some impermissible inference from the videotape of the pretest interview regarding Allain's willingness to take a polygraph examination, the court could have given the jury a limiting instruction as to the appropriate use of this evidence.

Instead of excluding the videotape outright as "polygraph evidence," the court was obligated to exercise its legal discretion in deciding whether to permit the jury to view the videotape by evaluating its probative value against its prejudicial effect, in the same manner that it would have considered any other extrinsic evidence offered for the purpose of establishing motive and bias of a witness. Because the court's ruling regarding the admissibility of the videotape of the pretest interview was not made on the basis of a correct view of the law but on the court's mistaken belief that the videotape was inadmissible "polygraph evidence," the court improperly excluded the videotape.

Furthermore, upon consideration of the entire record, we do not have a fair assurance that the exclusion of the videotape of the pretest interview did not substantially affect the verdict. The defendant has the burden of establishing harm from any nonconstitutional evidentiary error.[37] *State* v. *Gallo*, 135 Conn. App. 438, 443, 41 A.3d 1183 (2012), appeal dismissed, 310 Conn. 602, 78 A.3d 854 (2013). "[A] nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict. . . . [O]ur determination that the defendant was harmed by the trial court's [evidentiary rulings] is guided by the various factors that we have articulated as relevant [to] the inquiry of evidentiary harmlessness . . . such as the importance of the [evidence] . . . whether the [evidence] was cumulative, the presence or absence of evidence corroborating or contradicting the [evidence] on material points, the extent of cross-examination otherwise permitted, and, of course, the

overall strength of the prosecution's case." (Internal quotation marks omitted.) Id., 443–44.

The state argues that even if the court's ruling was improper, the defendant has not met his burden of establishing harm because the court's ruling could not have substantially affected the verdict. According to the state, the court only precluded the defendant from making references to the polygraph test itself, and, therefore, the defendant could, and did, question Allain about any motivations, inducements, or promises made to him prior to his testifying. The state also suggests that its case against the defendant was strong. The state contends that although the evidence of A.P.'s death was largely circumstantial, it was overwhelming. The state also asserts that "evidence of motive, means and opportunity was abundant," and notes that the defendant confessed to the murder to at least four different individuals. We disagree that the defendant has failed to demonstrate harm under the circumstances of this case.

The videotape of the pretest interview was offered for the limited and proper purpose of showing Allain's motivation for testifying in favor of the state against the defendant. A court commits reversible error whenever it unduly restricts a defendant's right to present evidence that tends to show motive, interest, bias, or prejudice on the part of a key government witness. *State* v. *Luzzi*, 147 Conn. 40, 46, 156 A.2d 505 (1959); see also *State* v. *Colton*, supra, 227 Conn. 250. The tape shows Madden and other officers repeatedly trying to convince Allain that it would be in his best interest to testify favorably for the state, indicating that they wanted him "on the team" and suggesting that if he cooperated in getting a conviction of the defendant, he would receive favorable treatment and likely escape any criminal charges himself. Moreover, from the videotaped interview, the jury would have had the opportunity to more fully assess Allain's mindset in agreeing to testify against the defendant, including his significant concerns regarding his fear of being charged with violating his probation. Additionally, the jury could reasonably conclude from the videotape that Madden attempted to shape Allain's story about the defendant's actions on May 29, 1996, in order to make it more plausible.

It is undisputed that Allain's trial testimony was an integral component, if not the linchpin, of the state's case against the defendant. He was the only witness with any direct knowledge of the events that led up to A.P.'s disappearance and his testimony corroborated the reliability of the defendant's alleged jailhouse confessions. Because the state's case against the defendant turned in large part on Allain's testimony in order to secure a conviction, the jury's assessment of Allain's credibility was crucial. Accordingly, any evidence of Allain's bias and motivation to tailor his testimony in

favor of the prosecution's case was critically important to the defense, and the videotape of the pretest interview was the most persuasive evidence available to the defendant because it reveals Allain's demeanor and concerns in living color.

The state correctly notes that the defendant was not precluded from raising during cross-examination the fact that Allain had been interviewed by the police or from exploring whether the state had offered Allain any incentives to testify against the defendant or pressured him to testify in a particular way. Our review of Allain's cross-examination shows that the defense challenged Allain's credibility by pointing out evidence tending to demonstrate that Allain had changed or augmented aspects of his story on a number of occasions. Cross-examination highlighted a number of details that he testified to on direct examination that he never disclosed in his prior written statements. The defense questioned Allain about his "interview" with Madden and, without mentioning that it occurred prior to a polygraph examination, noted the fact that the police believed he was not telling the truth about his involvement in A.P.'s murder, suggesting that Allain had incentive to cooperate with the state and implicate the defendant in order to keep the investigation away from him.

No cross-examination, however, could have substituted for or been as impactful as to Allain's motive and bias as the direct evidence afforded by the videotape. Although the defendant was allowed to question Allain regarding his "interview" with Madden, the defense was precluded, among other things, from revealing the context in which that interview occurred. That context was significant. The videotape reveals that the law enforcement officers used the context of the polygraph examination process to pressure Allain to inculpate the defendant in the (lengthy) pretest interview in the following way. Madden emphasized to Allain that the polygraph examination would definitively determine whether he was going to be part of the state's "team" that would "get" the defendant, "the big fish" in the case, and possibly receive a slap on the wrist himself, or, conversely, whether he would be fully prosecuted like the noncooperating witnesses in the Measles case. In our view, the videotape tends to show, among other things, the subtle but significant pressure placed on Allain by law enforcement through the means of the specific factual context in which the pretest interview occurred. No amount of generic questioning of Allain on cross-examination, without clarifying this important context, would show the precise degree, nature, and effect of both the inducements and pressure on Allain to inculpate the defendant that the videotape reveals. In other words, exclusion of the videotape and all references to polygraph deprived the defense of its best opportunity to show the degree of pressure, inducements and manipulation exerted on Allain. We are con-

vinced that had the jury been given an opportunity to view the pretest interview, the evidence may have significantly altered how the jury assessed Allain's testimony as a whole, possibly raising reasonable doubt about the guilt of the defendant. The defendant, therefore, is entitled to a new trial.

Our conclusion that a new trial is warranted because the court improperly excluded evidence of bias is dispositive of the defendant's appeal, thus eliminating the need to address the remainder of the defendant's evidentiary claims. Nevertheless, because the defendant's claims that the court improperly admitted prior misconduct evidence and improperly precluded the defendant from presenting expert testimony concerning the reliability of jailhouse informants are likely to arise again on remand, we also address those claims. See *State* v. *Arroyo*, 284 Conn. 597, 601 n.3, 935 A.2d 975 (2007).

## III

### ADMISSION OF PRIOR MISCONDUCT

The defendant claims that, on two occasions, the court improperly admitted unduly prejudicial evidence of prior misconduct. First, the defendant challenges the court's admission of testimony by K.S., a former girlfriend of Allain, that the defendant choked and raped her six months prior to the rape and murder of A.P. Second, the defendant challenges the admission of testimony by Ching that, during his time as the defendant's cellmate, the defendant asked Ching for his opinion about whether the defendant should "do in" Allain. The state responds that, in each instance, the court properly admitted the challenged testimony under a recognized exception to the general rule precluding evidence of a defendant's prior misconduct or on other grounds. See Conn. Code Evid. § 4-5. For the reasons we will set forth, we agree with the state that the court properly admitted the challenged testimony.[38]

Before turning to a discussion of each of the defendant's claims, we set forth the legal principles and standard of review generally applicable to the admissibility of evidence of prior misconduct. Section 4-5 of the Connecticut Code of Evidence provides: "(a) Evidence of other crimes, wrongs or acts of a person is inadmissible to prove the bad character, propensity, or criminal tendencies of that person except as provided in subsection (b).

"(b) Evidence of other sexual misconduct is admissible in a criminal case to establish that the defendant had a tendency or a propensity to engage in aberrant and compulsive sexual misconduct if: (1) the case involves aberrant and compulsive sexual misconduct; (2) the trial court finds that the evidence is relevant to a charged offense in that the other sexual misconduct is not too remote in time, was allegedly committed upon a person similar to the alleged victim, and was otherwise

similar in nature and circumstances to the aberrant and compulsive sexual misconduct at issue in the case; and (3) the trial court finds that the probative value of the evidence outweighs its prejudicial effect.

"(c) Evidence of other crimes, wrongs or acts of a person is admissible for purposes other than those specified in subsection (a), such as to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony.

"(d) In cases in which character or a trait of character of a person in relation to a charge, claim or defense is in issue, proof shall be made by evidence of specific instances of the person's conduct."

Under this rule, evidence of a defendant's prior misconduct generally is inadmissible to show that a defendant committed the crime charged or to show that the defendant is predisposed to commit that crime. Nevertheless, otherwise inadmissible prior misconduct evidence may be admitted if it is offered, not for propensity purposes, but "to prove intent, identity, malice, motive, a system of criminal activity or the elements of a crime." (Internal quotation marks omitted.) *State* v. *Pena*, 301 Conn. 669, 673, 22 A.3d 611 (2011).

Furthermore, our Supreme Court has explained that courts must apply a more liberal standard of admissibility in cases involving the admission of prior sexual misconduct. See *State* v. *Smith*, supra, 313 Conn. 334. "Under this standard, prior misconduct evidence may be admitted to establish propensity in sex related cases if certain conditions are met. . . . As we explained in [*State* v. *DeJesus*, supra, 288 Conn. 470–74], evidence of uncharged sexual misconduct is admissible only if it is relevant to prove that the defendant had a propensity or a tendency to engage in the type of aberrant and compulsive criminal sexual behavior with which he or she is charged. Relevancy is established by satisfying the liberal standard pursuant to which evidence previously was admitted under the common scheme or plan exception. Accordingly, evidence of uncharged misconduct is relevant to prove that the defendant had a propensity or a tendency to engage in the crime charged only if it is: (1) . . . not too remote in time; (2) . . . similar to the offense charged; and (3) . . . committed upon persons similar to the prosecuting witness." (Internal quotation marks omitted.) *State* v. *Smith*, supra, 334–35. This "exception to the rule barring propensity evidence applies whenever the evidence establishes that both the prior misconduct and the offense with which the defendant is charged were driven by an aberrant sexual compulsion, *regardless of whether the prior misconduct or the conduct at issue resulted in sexual offense charges*." (Emphasis added.) *State* v. *Snelgrove*, 288 Conn. 742, 760, 954 A.2d 165 (2008).

"[T]o minimize the risk of undue prejudice to the defendant, the admission of evidence of uncharged sexual misconduct under the limited propensity exception . . . must be accompanied by an appropriate cautionary instruction to the jury." *State* v. *DeJesus*, supra, 474.

"The admission of evidence of prior uncharged misconduct is a decision properly within the discretion of the trial court. . . . [E]very reasonable presumption should be given in favor of the trial court's ruling. . . . [T]he trial court's decision will be reversed only where abuse of discretion is manifest or where an injustice appears to have been done. . . . [T]he burden to prove the harmfulness of an improper evidentiary ruling is borne by the defendant . . . [who] must show that it is more probable than not that the erroneous action of the court affected the result." (Internal quotation marks omitted.) *State* v. *Heck*, 128 Conn. App. 633, 638, 18 A.3d 673, cert. denied, 301 Conn. 935, 23 A.3d 728 (2011).

In deciding whether evidence of prior misconduct falls within any of the exceptions to the general rule prohibiting the admission of such evidence, we have employed a two part analysis. See *State* v. *Kalil*, 314 Conn. 529, 540, 107 A.3d 343 (2014). "First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. Second, the probative value of such evidence must outweigh the prejudicial effect of the other crime evidence." (Internal quotation marks omitted.) Id. "[R]egardless of the nature or the purpose for which evidence is being offered, this court has identified four factors relevant to determining whether the admission of otherwise probative evidence is unduly prejudicial. These are: (1) where the facts offered may unduly arouse the [jurors'] emotions, hostility or sympathy, (2) where the proof and answering evidence it provokes may create a side issue that will unduly distract the jury from the main issues, (3) where the evidence offered and the counterproof will consume an undue amount of time, and (4) where the defendant, having no reasonable ground to anticipate the evidence, is unfairly surprised and unprepared to meet it." (Internal quotation marks omitted.) *State* v. *Hill*, 307 Conn. 689, 698, 59 A.3d 196 (2013). With those principles in mind, we now turn to the specific claims raised by the defendant.

A

The defendant first claims that the court improperly allowed K.S., a former girlfriend of Allain's, to testify that the defendant had choked and raped her in November, 1995. We disagree.

The following additional facts are relevant to this aspect of the defendant's claim. In November, 1995, K.S. was thirteen years old and a girlfriend of Allain. Allain introduced K.S. to the defendant. On November 26, 1995, at approximately 10 p.m., K.S. was picked up

by the defendant in his pickup truck. She went with the defendant to his trailer, which was behind the homes of the defendant's parents, believing that Allain would join them later. The defendant provided K.S. with beer and whiskey, which she drank while she waited for Allain to arrive. The defendant received a call on his cell phone, which he told K.S. was from Allain, who could not leave home to join them. K.S. asked to leave at that point, but the defendant told her that she was not going anywhere. She tried to open the trailer door to leave, but it was locked. At that point, the defendant pushed K.S. over to his bed, where he choked and raped her. At about 5 a.m. the defendant left the trailer to make a phone call in his parents' house, threatening K.S. that he would hunt her down and kill her if she tried to leave the trailer. After the defendant left, K.S., fearing that this might be her only opportunity "to make it out alive," ran to the nearest home and called the police and her father. The defendant later was arrested.

Prior to trial, the state filed a motion in limine giving notice of its intent to call K.S. as a witness who would testify about being raped by the defendant. The state primarily argued that her testimony was admissible to show a common plan or scheme, although the state also argued that it was admissible to show motive, intent, identity and to corroborate crucial prosecution testimony. The defendant filed a written opposition to the motion in limine arguing that the testimony was not relevant to any exception to the general rule barring the admission of prior misconduct evidence and, alternatively, that the evidence was far more prejudicial than probative. Prior to ruling on the admissibility of K.S.'s testimony, K.S. testified about the prior rape to the court outside the presence of the jury. Following that testimony, and after hearing additional oral argument, the court ruled that K.S.'s testimony was admissible.

The court, citing *State* v. *Snelgrove*, supra, 288 Conn. 760, first determined that because the defendant was charged with the capital felony of causing the death of A.P. in the course of committing a sexual assault in the first degree, this case properly was viewed as a sex crime case despite the state's not having charged the defendant directly with a sexual assault. On the basis of that determination, the court found that the more liberal test set forth in *State* v. *DeJesus*, supra, 288 Conn. 418, applied to the admission of K.S.'s testimony. Applying that test, the court found that evidence of the defendant's sexual assault of K.S. was relevant to the defendant's propensity to engage in aberrant and criminal sexual behavior because it was not too remote in time, the incident was similar in many ways to the sexual assault that led to A.P.'s murder, and it was committed upon a similar person. The court also found that the evidence was more probative than prejudicial. On the basis of those findings, the court ruled that K.S.'s testimony was admissible for propensity purposes and

instructed the jury that, if it believed the testimony, the jury could consider it for "its bearing on any matter to which [the jury found] it relevant, including, specifically, motive and whether the defendant acted under a common scheme or plan." After K.S. testified to the jury about the 1995 incident, the court repeated its limiting instruction.

On the basis of our review of the record, we conclude that the court properly exercised its discretion in admitting K.S.'s testimony. Our review is guided by subsection (b) of § 4-5 of the Connecticut Code of Evidence, set forth previously, which codifies the exception, first recognized in *DeJesus*, that evidence of prior sexual misconduct may be admitted to show a defendant's propensity to engage in similar misconduct. Before permitting K.S. to testify, the court made all necessary determinations regarding each of the three elements set forth in the rule necessary to admit evidence of prior sexual misconduct for propensity purposes.

The first requirement of the rule pertains to the applicability of the exception and requires that the court determine whether the case in which the prior misconduct evidence is offered "involves aberrant and compulsive sexual misconduct . . . ." Conn. Code Evid. § 4-5 (b) (1). The court properly determined that such conduct was involved in the present case. As the trial court indicated, that determination does not hinge on whether the defendant was charged with a sexual assault in the present case, but only on whether the prior misconduct and the offense presently charged each were "driven by an aberrant sexual compulsion, regardless of whether the prior misconduct or the conduct at issue resulted in sexual offense charges." (Internal quotation marks omitted.) *State* v. *Johnson*, 289 Conn. 437, 454, 958 A.2d 713 (2008), overruled in part on other grounds by *State* v. *Payne*, 303 Conn. 538, 548, 34 A.3d 370 (2012); *State* v. *Snelgrove*, supra, 288 Conn. 760. In the present case, the defendant, in furtherance of the capital felony for which he was charged, was alleged to have used a teenage boy to isolate a teenage girl and then raped and choked her. Such behavior—followed by threats of death in the case of K.S. and murder in the case of A.P.—constituted aberrant and potentially compulsive sexual misconduct sufficient to support the court's initial determination regarding the applicability of the propensity exception in this case.

Second, the court was required to determine if K.S.'s testimony about the prior sexual misconduct was relevant to the offense currently charged. The relevancy requirement is met if the prior sexual misconduct "is not too remote in time, was allegedly committed upon a person similar to the alleged victim, and was otherwise similar in nature and circumstances to" the misconduct in the present case. Conn. Code Evid. § 4-5 (b) (2). The court properly found that each of these requirements

was met. The defendant's rape of K.S. occurred just six months prior to the sexual assault and murder of A.P., and, thus, clearly was not too remote in time. See *State* v. *Antonaras*, 137 Conn. App. 703, 716, 49 A.3d 783, and cases cited therein (holding even nine year and ten year gaps not too remote in time), cert. denied, 307 Conn. 936, 56 A.3d 716 (2012). The court also properly determined that the sexual assaults were committed upon similar persons on the basis of its findings that "these were both very young girls—one, thirteen; one fifteen—from the same town who both were girlfriends of [Allain]." Last, the sexual assaults at issue were otherwise sufficiently similar in nature and circumstances for the reasons cited by the court, including that both incidents involved Allain, who had arranged for the young victims to meet the defendant, both incidents occurred late at night, the defendant had provided alcohol to both victims, both victims were driven by the defendant to a secluded location where they were both sexually assaulted and choked by the defendant. See *State* v. *Smith*, supra, 313 Conn. 337 (concluding trial court properly determined charged crime and uncharged misconduct sufficiently similar to satisfy *DeJesus* exception because both acts involved sexual assaults in which victim was choked by attacker).

Finally, the trial court properly considered whether the probative value of K.S.'s testimony outweighed its prejudicial effect before admitting K.S.'s testimony, and provided the jury with a limiting instruction that was based upon the instruction set forth in *DeJesus*, the purpose of which was to limit any prejudicial effect. *State* v. *DeJesus*, supra, 288 Conn. 474 and n.36. It is well settled that "[t]he primary responsibility for conducting the balancing test to determine whether the evidence is more probative than prejudicial rests with the trial court, and its conclusion will be disturbed only for a manifest abuse of discretion. . . . [Thus, our] review of such rulings is limited to the questions of whether the trial court correctly applied the law and [whether it] reasonably could have reached the conclusion that it did." (Citations omitted; internal quotation marks omitted.) *State* v. *James G.*, 268 Conn. 382, 396, 844 A.2d 810 (2004). Although the defendant claims that the admission of K.S.'s testimony "created a very strong likelihood that the jury's emotions were unduly roused," and that this prejudicial effect outweighed any probative value, we are unconvinced. Clearly, given the similarities between the sexual assaults of K.S. and A.P., K.S.'s testimony was highly probative. In a case in which the defendant is accused of brutally sexually assaulting and murdering a young woman and disposing of her body, it is unlikely that the addition of K.S.'s testimony would have unduly roused the emotions or passions of the jury further. Nor did the testimony consume an unreasonable amount of time, raise any distracting side issues, or surprise the defense. On the basis of our

review, we cannot say that the court abused its discretion by admitting the testimony of K.S.

B

The defendant also contends that the court improperly permitted Ching to testify that the defendant had asked him his opinion on whether the defendant should kill Allain. The state argued at trial that this was not evidence of uncharged misconduct, and, therefore, was not improperly admitted as such and argues on appeal that the court properly admitted the testimony as relevant evidence of the defendant's consciousness of guilt. We agree with the state on both points and, thus, reject the defendant's claim.

The following additional facts are relevant to this claim. Ching testified at trial that he had shared a cell with the defendant for two weeks at the Corrigan-Radgowski Correctional Center in 2007. During that time, the defendant told Ching that he and a younger man had taken a fifteen year old girl out on his boat, gotten her drunk, and raped her. Ching did not recall the defendant giving him the name of either the girl or the young man. Ching testified that the defendant had admitted to killing the girl after she "started flipping out," and that "[t]he young man that was with him refused to cooperate in helping with this" and "he killed her on his own and hid the body."

When the state inquired during its direct examination of Ching whether the defendant had talked to Ching about the young man, Ching responded: "He asked my opinion if I thought he should, you know, do the guy in . . . ." After the state followed up by asking Ching how he interpreted that inquiry, defense counsel objected on relevancy grounds, arguing that although what his client said to Ching was admissible, Ching's interpretation of what he said was not. The court overruled the objection and counsel then asked to be heard outside the presence of the jury. After the jury was excused, defense counsel argued that although the state had disclosed its intent to offer evidence about the defendant's prior sexual assault of K.S., it had never disclosed that it intended to present evidence that the defendant had discussed killing a witness. Defense counsel moved for a mistrial, arguing that it was highly prejudicial to have this information, which he described as evidence of uncharged misconduct, blurted out to the jury absent any prior notice to the defendant. The state responded that it did not believe the information disclosed was uncharged misconduct, and, therefore, they had no obligation to disclose it. The state viewed the testimony as part of the conversation between the inmates and was not claiming that the defendant took any affirmative steps to kill anyone or to make anyone fear that they were going to be killed. The court took a brief recess during which the court met with counsel in chambers off the record.

Following that recess, the court indicated that the parties had agreed to a further proffer regarding the witness. In response to questions by the state, outside the presence of the jury, Ching disclosed that he had interpreted the defendant's inquiry about "doing" the young man as asking Ching's opinion about whether he should kill the young man who was with him on the boat. Ching further disclosed that he had told the defendant that, if he was in the defendant's situation, he would do so, and that this same conversation had been repeated three or four times over the course of the two weeks that Ching was housed with the defendant.

After hearing additional argument from both sides, the court denied the defendant's motion for a mistrial and ruled that Ching's testimony was admissible, treating it as prior misconduct evidence, but ruling that it was nonetheless admissible because it was relevant to corroborate crucial prosecution testimony and because its probative value outweighed any prejudicial effect. When the jury returned, the court gave a limiting instruction in which it indicated that the state had offered evidence of uncharged misconduct, that it was admitted not to prove the defendant's bad character or tendency to commit criminal acts, but only to corroborate crucial prosecution testimony, and, that if the jury believed the testimony, it was to consider the evidence only for that purpose and not as evidence demonstrating a propensity to commit the crimes charged. The examination of Ching continued. The state never asked any additional questions regarding the defendant's inquiries about "doing in" Allain. Defense counsel revisited the topic on cross-examination, getting Ching to admit that he had never mentioned that aspect of his conversation with the defendant in his prior statements to the police, and that he had first brought the issue to the attention of the state only a few weeks ago.

The defendant contends on appeal that Ching's testimony that the defendant had mused about whether he should have Allain killed constituted evidence of uncharged misconduct that was not previously disclosed to the defense, and that the court improperly denied its motion for a mistrial claiming unfair surprise and improper admission of the testimony for corroborative purposes. According to the defendant, nothing about the challenged portion of Ching's testimony corroborated the state's allegations that the defendant had sexually assaulted, kidnapped, or killed A.P., and, even assuming that Ching's testimony was true, it tended to show only that the defendant was angry at Allain for falsely accusing him of murder.

At trial, in addition to arguing that Ching's statement was admissible for the purpose of corroborating crucial prosecution testimony, the state argued, in the alternative, that the testimony did not constitute evidence of misconduct. The court rejected that argument. In cham-

bers, the state also advanced the argument that Ching's statement was admissible as evidence of consciousness of guilt. Although the state did not pursue that ground in its arguments before the trial court, in its appellate brief, the state urges us to conclude that Ching's testimony was relevant to show the defendant's consciousness of guilt and thus admissible on that alternate ground.

Having reviewed the record and the arguments of the parties, we conclude that the trial court incorrectly labeled Ching's testimony as uncharged misconduct committed by the defendant. Ching's statement indicated only that the defendant had spoken to Ching about the possibility of killing Allain. Although such thoughts or ideations may certainly have reflected poorly upon the defendant in the eyes of the jury, without more, they do not constitute "a clear expression of prior misconduct on the part of the defendant." *State* v. *Gilbert I.*, 106 Conn. App. 793, 799, 944 A.2d 353 (vague reference to fact that defendant and babysitter "did something and Mom kicked [the babysitter] out" did not constitute evidence of prior uncharged misconduct [internal quotation marks omitted]), cert. denied, 287 Conn. 913, 950 A.2d 1289 (2008). Accordingly, there is no merit to the defendant's argument that Ching's statement was inadmissible evidence of prior misconduct.

"[W]e are mindful of our authority to affirm a judgment of a trial court on a dispositive alternate ground for which there is support in the trial court record." (Internal quotation marks omitted.) *State* v. *Vines*, 71 Conn. App. 359, 366–67, 801 A.2d 918, cert. denied, 261 Conn. 939, 808 A.2d 1134 (2002). Having concluded that Ching's statement did not constitute evidence of uncharged misconduct, we nevertheless agree with the state that Ching's statement constituted evidence of consciousness of guilt and therefore was admissible on that basis.

"[E]vidence is admissible to prove consciousness of guilt if, first, it is relevant, and second, its probative value outweighs its prejudicial effect." *State* v. *Hill*, supra, 307 Conn. 698. "In a criminal trial, it is relevant to show the conduct of an accused, as well as any statement made by him subsequent to the alleged criminal act, which may fairly be inferred to have been influenced by the criminal act. . . . The state of mind which is characterized as guilty consciousness or consciousness of guilt is strong evidence that the person is indeed guilty . . . and, under proper safeguards . . . is admissible evidence against an accused." (Internal quotation marks omitted.) *State* v. *Camacho*, 92 Conn. App. 271, 294, 884 A.2d 1038 (2005), cert. denied, 276 Conn. 935, 891 A.2d 1 (2006). "[T]he fact that ambiguities or explanations may exist which tend to rebut an inference of guilt does not render [such] evidence . . . inadmis-

sible but simply constitutes a factor for the jury's consideration. . . . The fact that the evidence might support an innocent explanation as well as an inference of a consciousness of guilt does not make [the admission of evidence of consciousness of guilt] erroneous. . . . Moreover, [t]he court [is] not required to enumerate all the possible innocent explanations offered by the defendant." (Internal quotation marks omitted.) *State* v. *Coccomo*, 302 Conn. 664, 670, 31 A.3d 1012 (2011).

Here, the evidence was relevant because if the jury believed Ching's testimony that the defendant had asked him for his opinion about whether to "do in" Allain, it reasonably could have inferred that the inquiry was directly related to the charges pending against the defendant and that the defendant did not want Allain testifying against him. Threats by a defendant against a witness generally are deemed admissible "either on the theory that such conduct is inconsistent with the defendant's claim of innocence or on the theory that the making of such threats evinces a consciousness of guilt." *State* v. *Walker*, 214 Conn. 122, 129, 571 A.2d 686 (1990). Although the defendant in the present case stopped short of directly threatening a witness, a jury nonetheless reasonably could have inferred that his statement to Ching constituted circumstantial evidence of his desire to keep his criminal activities from being revealed and, thus, his consciousness of guilt. In addition to being relevant evidence, nothing in the record before us leaves us with the impression that Ching's statement was so unduly prejudicial as to overcome its probative value. The jury had already heard evidence about the defendant's violent nature. Ching's statement that the defendant had been thinking about killing Allain was therefore unlikely to have unduly aroused the jurors' emotions. We accordingly reject the defendant's claim that Ching's statement was improperly admitted.

IV

EXCLUSION OF EXPERT TESTIMONY

Finally, we turn to the defendant's claim that the court improperly excluded expert testimony regarding the use and effect of informant testimony. According to the defendant, because the case against him depended heavily upon the testimony of jailhouse informants, some if not all of whom benefited from cooperating with the state, the court should have permitted him to present expert testimony to the jury concerning the general unreliability of such evidence. The defendant contends that the information that he sought to present is not within the knowledge of the average juror, nor was it supplied to them through other evidence or by the court's instructions. The defendant claims that the court not only abused its discretion by precluding the expert testimony, but that it also violated his right to due process, and his rights under the sixth amendment to confront witnesses and to present a defense.

In response, the state argues that the court properly excluded the expert testimony because the subject matter of the testimony was within the ken of the average juror and because allowing the testimony would have invaded the province of the jury, namely, its exclusive function as trier of fact to assess the credibility of witnesses. We agree with the defendant that the court abused its discretion by precluding the expert testimony offered by the defendant. We hold that expert testimony concerning the reliability of informant testimony should be admitted if the court on remand determines that the expert is qualified and the proffered testimony is relevant to the specific issues in the case.[39]

The following additional facts are relevant to our resolution of this claim. The defense disclosed Alexandra Natapoff, a professor at Loyola Law School, as a witness who the defendant intended to call regarding the general unreliability of informant testimony. The state filed a motion in limine to exclude Natapoff's testimony, arguing that (1) the substance of the anticipated testimony concerned matters within the general knowledge of jurors, and (2) the witness' opinions would invade the exclusive province of the jury to assess the credibility of witnesses. The state also argued, in essence, that Natapoff's testimony was unnecessary because the state anticipated that the court would instruct the jury concerning testimony by jailhouse informants in accordance with our Supreme Court's mandate in *State* v. *Arroyo*, 292 Conn. 558, 569–71, 973 A.2d 1254 (2009), cert. denied, 559 U.S. 911, 130 S. Ct. 1296, 175 L. Ed. 2d 1086 (2010).

In *Arroyo*, our Supreme Court acknowledged the growing recognition by the legal community that jailhouse informant testimony is inherently unreliable and is a major contributor to wrongful convictions throughout this country. Id., 567, 569. The Supreme Court noted: "In recent years, there have been a number of high profile cases involving wrongful convictions based on the false testimony of jailhouse informants. See, e.g., R. Bloom, 'Jailhouse Informants,' 18 Crim. Just. 20 (Spring 2003). Several of these cases resulted in formal investigations that shed much needed light on the extensive use of jailhouse informants in criminal prosecutions, an issue that previously had been 'largely a closeted aspect of the criminal justice system.' Id. One such investigation, by a grand jury in Los Angeles [C]ounty, California, revealed an 'appalling number of instances of perjury or other falsifications to law enforcement . . . .' (Internal quotation marks omitted.) C. Sherrin, 'Jailhouse Informants, Part I: Problems with their Use,' 40 Crim. L. Q. 106, 113 (1997). The grand jury also 'found that a particularly clever informant realizes that a successful performance on the witness stand is enhanced if it appears he or she is not benefiting from the testimony. . . . These informants wait until after

they've testified to request favors—a request that is generally answered. . . . And, because the reward is not offered before the testimony, the jury has no way to measure the informant's motivation to fabricate testimony, as the prosecutor . . . is under no obligation to disclose nonexisting exculpatory evidence.' . . . R. Bloom, supra, 18 Crim. Just. 24. Thus, the expectation of a '[r]eward for testifying is a systemic reality'; id.; even where the informant has not received an explicit promise of a reward. In addition, several commentators have pointed out that jailhouse informants frequently have motives to testify falsely that may have nothing to do with the expectation of receiving benefits from the government." (Footnotes omitted.) *State* v. *Arroyo*, supra, 292 Conn. 567–69. In its discussion, the court also recognizes Professor Natapoff's expertise in this area by citing to her research. Id., 568 n.8.

Accordingly, our Supreme Court mandated that, going forward, trial courts in this state must give a special credibility instruction to the jury any time informant testimony was used, regardless of whether the informant had been promised any benefit for his or her testimony. Id., 569. Specifically, the court indicated that trial courts should instruct the jury "that the informant's testimony must be reviewed with particular scrutiny and weighed . . . with greater care than the testimony of an ordinary witness. . . . In addition, the trial court may ask the jury to consider: the extent to which the informant's testimony is confirmed by other evidence; the specificity of the testimony; the extent to which the testimony contains details known only by the perpetrator; the extent to which the details of the testimony could be obtained from a source other than the defendant; the informant's criminal record; any benefits received in exchange for the testimony; whether the informant previously has provided reliable or unreliable information; and the circumstances under which the informant initially provided the information to the police or the prosecutor, including whether the informant was responding to leading questions." (Citation omitted; internal quotation marks omitted.) Id., 570–71.

Prior to the court's hearing argument on whether to exclude Natapoff as a witness, Natapoff testified outside the presence of the jury. After testifying as to her educational background and professional credentials, which included authoring various scholarly works and testifying before Congress on the subject of informants,[40] Natapoff testified about the inherent problems associated with the use of jailhouse informants. According to Natapoff, the manner in which informants are used in the criminal justice system is largely unregulated and secretive, and the public has very little knowledge about the process. She testified that jailhouse informants are known to fabricate information because they are aware that they can barter with the state for favorable treatment on the basis of such information.

In particular, Natapoff stated: "We have evidence of collusion between jailhouse informants in which informants cooperate in order to create stories that they corroborate in order to persuade the government to use that information. We know that sometimes informants and criminal offenders can be very entrepreneurial about coming up with information, knowing that the system will likely reward them in some way." The hope for favorable treatment also provides a strong incentive for informants to search out any source of information, reliable or not, so that they can trade that information to the authorities.

Natapoff also testified about studies that demonstrate that the usual cautionary instructions given to jurors about informant testimony generally are not effective and that even if jurors are made aware of and cautioned about an informant's compensation or other motivation to fabricate testimony, jurors are ill-equipped to accurately evaluate an informant's credibility and often will accept the testimony as true. One study published by Northwestern Law School, discussed by Natapoff during her testimony, indicated that approximately 45 percent of all the wrongful capital convictions identified in this country were the direct result of an informant who was lying. According to Natapoff, informants' stories are often difficult to corroborate or to contradict, especially in cases in which the informant's testimony is the central evidence against the defendant.

On cross-examination, the state questioned Natapoff about the fact that permitting experts to testify before juries was not among the reforms Natapoff had proposed in her book and asked Natapoff what information she believed a jury could not be expected to have knowledge of based upon common sense alone. Natapoff responded as follows: "I think that a lay person on a jury cannot know the extent of the benefits and expectations that an informant in our system would reasonably expect to get; that a promise or an understanding made by a police officer or prosecutor to an informant, and the history of the use of informants in our jails and prisons give informants and law enforcement knowledge about benefits that a lay person couldn't understand and wouldn't see from the outside. . . . I think a lay person would not expect or could not be expected to understand how much effort informants sometimes put into coming up with information from stealing files from other inmates to calling outside sources and asking for resources from the newspapers and media from outside sources. They couldn't be expected to understand the culture in jails; the understanding that this entrepreneurial approach to information is expected. A lay person on a jury could not be expected to know how infrequent perjury prosecutions are for informants who turn out to be lying. In polling jurors after trials or after cases where a wrongful conviction is found, you sometimes hear jurors say that they think that if

an informant lies, they'll be prosecuted for perjury but because that is so rare, that expectation is misguided, although it's a widely shared expectation, I think, among the public."

At the conclusion of Natapoff's testimony, the court heard additional argument from the parties. The state argued that making credibility determinations fell within the exclusive province of the jury as fact finders "into which no expert may venture," quoting this court's decision in *State* v. *Favoccia*, 119 Conn. App. 1, 29, 986 A.2d 1081 (2010), aff'd, 306 Conn. 770, 51 A.3d 1002 (2012). The state further argued that any concerns that the defense sought to alleviate through Natapoff's testimony would be adequately covered by the instruction mandated by our Supreme Court in *Arroyo*. The state also made a direct analogy between the testimony that the defense sought to elicit from Natapoff and expert testimony concerning the reliability of eyewitness testimony, which, at that time, the Supreme Court had held may be properly excluded. See *State* v. *McClendon*, 248 Conn. 572, 586, 730 A.2d 1107 (1999) (holding average juror aware of factors affecting reliability of eyewitness identification and expert testimony on issue disfavored because it would invade province of jury to determine weight to give evidence), overruled in part by *State* v. *Guilbert*, 306 Conn. 218, 253, 49 A.3d 705 (2012); *State* v. *Kemp*, 199 Conn. 473, 477, 507 A.2d 1387 (1986) (same), overruled in part by *State* v. *Guilbert*, 306 Conn. 218, 253, 49 A.3d 705 (2012).

The defense argued that Natapoff's testimony would impart uniquely insightful information to the jury and would not invade the jury's province to assess credibility because she would not offer an opinion about the credibility of any particular witness. Natapoff's testimony would provide only background information and would describe and put into context the rather opaque circumstances surrounding the development and use of jailhouse informants. Further, the defense disagreed that an *Arroyo* instruction offered all of the same information, particularly in light of the studies showing that such instructions had no appreciable difference on jurors. Finally, the defense noted that Natapoff's testimony was especially relevant in the present case because the state's case was built largely on the testimony of informants.

After taking a short recess, the court rendered the following oral ruling: "It is the court's ruling that the proffered expert testimony of Professor Natapoff would indeed invade the very core function of the jury; that is, to assess the credibility of the witnesses, and so I am going to sustain the state's objection to her testimony. The court did have an opportunity to review the recent *Favoccia* case . . . which confirms that credibility determinations are within the exclusive province of the fact finder. The subject matter about which Pro-

fessor Natapoff would testify is not, in the court's view, outside the common experience, ken, or common knowledge of the jury; the court cites [*State* v. *McClendon*, supra, 248 Conn. 586]. Although Professor Natapoff may reference certain studies and research about which the jury may not be aware, that does not make her conclusions about the marketplace or exchange of information for certain benefits outside the common experience or ken of the jury. The court has given wide latitude throughout the cross-examination of the witnesses concerning any possible consideration for testimony or anticipation of benefits in exchange for testifying for the state, and the jury certainly will have that information to consider in making its credibility determinations. Finally, of course, the court will be instructing the jury in accordance with [*State* v. *Arroyo*, supra, 292 Conn. 569–71], as to the testimony of incarcerated witnesses. So, for these reasons, the court sustains the state's objections to the testimony of Professor Natapoff."

Accordingly, Natapoff was not permitted to testify before the jury. Later, as part of the court's jury charge, the court gave an instruction regarding informant testimony, cautioning the jurors to consider such testimony with "particular care" and to "scrutinize it very carefully before you accept it."[41]

At the outset, we note that "[a] witness qualified as an expert by knowledge, skill, experience, training, education or otherwise may testify in the form of an opinion or otherwise concerning scientific, technical or other specialized knowledge, if the testimony will assist the trier of fact in understanding the evidence or in determining a fact in issue." Conn. Code Evid. § 7-2. "[I]n order to be admissible, the proffered expert's knowledge must be directly applicable to the matter specifically in issue." *State* v. *Douglas*, 203 Conn. 445, 453, 525 A.2d 101 (1987). "The true test for the admissibility of expert testimony is whether the witnesses offered as experts have any peculiar knowledge or experience, not common to the world, which renders their opinions founded on such knowledge or experience any aid to the court or the jury in determining the question at issue. . . . The test for admissibility is not limited to matters of scientific knowledge. Generally, expert testimony may be admitted if the witness has a special skill or knowledge, beyond the ken of the average juror, that, as properly applied, would be helpful to the determination of an ultimate issue. . . . The trial court has wide discretion in ruling on the admissibility of expert testimony and, unless that discretion has been abused or the error is clear and involves a misconception of the law, its ruling will not be disturbed." (Citations omitted; internal quotation marks omitted.) *State* v. *Palmer*, 196 Conn. 157, 166, 491 A.2d 1075 (1985).

On the basis of our review of the record and the

arguments of the parties, we conclude that the court abused its discretion by granting the state's motion in limine and excluding Natapoff as a witness, especially in light of the fact that, in the present case, informants played a crucial role in the state's case against the defendant. The court provided scant analysis for its decision, essentially stating two reasons for precluding Natapoff from testifying as an expert. First, the court stated that Natapoff's testimony would invade the jury's core function of assessing the credibility of witnesses. Second, the court concluded that the subject matter of Natapoff's testimony was within the common knowledge of the jury. Both rationales, however, are belied by the substance of Natapoff's unchallenged proffer, and our Supreme Court's acknowledgement of the inherent unreliability of informant testimony in *Arroyo* and the need to further educate jurors on this topic. Moreover, the case law cited by the court is not controlling and does not support the court's ruling.

We begin with the court's conclusion that Natapoff's testimony would invade the jury's exclusive province to determine the credibility of witnesses. The court indicated that it reached its decision on the basis of its review of this court's decision in *State* v. *Favoccia*, supra, 119 Conn. App. 1, a case that was cited by the state. The court's reliance on *Favoccia*, however, is misplaced.

*Favoccia* involved the sexual abuse of a child. The issue before this court was whether a psychologist, who was offered by the state as an expert witness to explain to the jury about characteristics and behaviors commonly exhibited by child sex abuse victims, improperly was permitted to testify about the particular victim in that case and if she had exhibited the type of behavior described by the expert because such testimony constituted inadmissible vouching for the credibility of a witness. We held that the expert's testimony "crossed the line of permissible expert opinion" because her testimony "went beyond a general discussion of characteristics of sexual abuse victims and offered opinions, based on her review of the videotaped forensic interview and other documentation, as to whether this particular victim in fact exhibited the specified behaviors . . . ." Id., 23. Our decision later was affirmed by our Supreme Court; see *State* v. *Favoccia*, 306 Conn. 770, 805–807, 51 A.3d 1002 (2012); albeit after the ruling challenged in the present appeal was rendered.

We began our analysis by noting generally that "[t]he determination of the credibility of a witness is solely the function of the jury. . . . It is the trier of fact which determines the credibility of witnesses and the weight to be accorded their testimony. . . . Expert witnesses cannot be permitted to invade the province of the jury *by testifying as to the credibility of a particular witness or the truthfulness of a particular witness'*

*claims.*" (Emphasis added; internal quotation marks omitted.) *State* v. *Favoccia*, supra, 119 Conn. App. 18. We later reiterated that "[c]redibility determinations are the exclusive province of the fact finder, into which no expert may venture." Id., 29.

*Favoccia*, however, did not alter our well settled rule as set forth in *State* v. *Spigarolo*, 210 Conn. 359, 378, 380, 556 A.2d 112, cert. denied, 493 U.S. 933, 110 S. Ct. 322, 107 L. Ed. 2d 312 (1989), that experts are permitted to testify in sex abuse cases "to demonstrate or explain in general terms the behavioral characteristics of child abuse victims in disclosing alleged incidents"; id., 380; and that such expert testimony is admissible precisely because it "is of valuable assistance to the trier in assessing the minor victim's credibility." (Internal quotation marks omitted.) *State* v. *Favoccia*, supra, 306 Conn. 787.

In *Spigarolo*, our Supreme Court rejected the defendant's argument that testimony by an expert would usurp the jury's function of assessing the credibility of witnesses. The court found such concerns unfounded because the expert "was not asked about the credibility of the particular victims in this case, nor did she testify as to their credibility." *State* v. *Spigarolo*, supra, 210 Conn. 379. The court stressed that in determining the admissibility of expert testimony, a critical distinction must be recognized between admissible expert testimony limited to general or typical behavior patterns and inadmissible testimony directly related to a particular witness' credibility. Id., 378–79.

Our decision in *State* v. *Favoccia*, supra, 119 Conn. App. 1, as affirmed by our Supreme Court, thus stands for the general proposition that, although credibility determinations ultimately must be left to the jury, expert testimony nevertheless is admissible if it can provide a jury with generalized information or behavioral observations that are outside the knowledge of an average juror and that would assist it in assessing a particular witness' credibility. As long as the expert does not directly opine about a particular witness' credibility or, as in *Favoccia*, testify in such a way as to vouch indirectly for or bolster the credibility of a witness, the expert's testimony would not invade the province of the jury to decide credibility and may be admitted. *State* v. *Favoccia*, supra, 306 Conn. 803–805.

In deciding to exclude Natapoff's testimony on the basis of *Favoccia*, the court did not refer to any particular portion of Natapoff's testimony that it believed would cross the line into impermissible expert testimony regarding credibility. Natapoff, in fact, offered no testimony regarding any of the particular informants in this case, either with respect to their status as informants, how they had obtained their information, or their potential reliability as witnesses. The defense clearly indicated to the court during argument that the defen-

dant did not intend to ask Natapoff about the present case, and that Natapoff had no specific knowledge of the case or the informants involved. Natapoff's testimony, as proffered, was narrowly tailored to provide only general information related to informant testimony and its unreliability, an issue clearly recognized by our Supreme Court in *State* v. *Arroyo*, supra, 292 Conn. 567–70. Our review of her testimony reveals that it could have aided the jury in making its own informed and independent assessment regarding the credibility of the informants in the present case. Accordingly, the court abused its discretion by excluding Natapoff's testimony on the ground that it invaded the province of the jury to decide the credibility of witnesses.

The court also abused its discretion when it concluded that the subject matter of Natapoff's testimony was within the common knowledge of the average juror. The court provided no legal or factual basis for that determination. The court never expressly stated that it was rejecting Natapoff's testimony or that it found unreliable the underlying studies, some of which had already been cited with approval by our Supreme Court. The state offered nothing to counter Natapoff's testimony that, based on these studies, expert testimony would provide significant information to the jury that is not known by the average juror. Indeed, we are aware of no empirical studies, nor were any provided by the state, that suggest the subject matter of Natapoff's testimony was well within the knowledge of the average lay person.

To the contrary, Natapoff testified that even if average jurors had some limited knowledge related to the use of jailhouse informants, they did not understand the true culture of jails or the full extent to which informants could benefit in our criminal justice system. She explained that a juror could not be expected to understand the efforts informants put forth to obtain their information or the possible sources for that information. Further, according to Natapoff's research, jurors often have a misguided understanding regarding the consequences an informant likely will face if he or she lies. She explained that although perjury prosecutions of informants are rare, jurors nevertheless often believe the threat of perjury charges plays an important role in ensuring that an informant tells the truth. Natapoff testified that without access to background information, jurors are ill-equipped to assess properly an informant's credibility, even in the face of an instruction asking them to take great care in doing so. In the face of Natapoff's uncontested testimony that jurors were not fully aware of the dangers in relying on informant testimony and that expert testimony could assist jurors in properly evaluating an informant's credibility, the court abused its discretion by concluding that the substance of Natapoff's testimony was within the ken of the average juror.

In finding that the information Natapoff had to convey was within the ken of the average juror, the court cited favorably without discussion to our Supreme Court's decision in *State* v. *McClendon*, supra, 248 Conn. 586. In *McClendon*, the court reaffirmed its decision in *State* v. *Kemp*, supra, 199 Conn. 477, that a trial court does not abuse its discretion by excluding expert testimony on the reliability of eyewitness testimony because the general principles of why such testimony may be unreliable were something that was "within the knowledge of jurors and expert testimony generally would not assist them in determining the question." (Internal quotation marks omitted.) *State* v. *McClendon*, supra, 586. Because *Kemp* and *McClendon* did not involve informant testimony, and thus were in no way binding on the trial court, they represented, at best, the Supreme Court's resolution of an arguably analogous issue.[42] As we have already explained, however, the only real evidence before the trial court was that jurors did not have a full understanding of the role of informants and the inherent unreliability of their testimony, and that expert testimony could aid the jury in assessing the credibility of informants, a number of whom had testified against the defendant in the present case.

Further, given that our Supreme Court has since overruled *Kemp* and *McClendon*; see *State* v. *Guilbert*, 306 Conn. 218, 253, 49 A.3d 705 (2012); and has concluded that a trial court may abuse its discretion by refusing to permit expert testimony on the reliability of eyewitness identifications, the court's citation to *McClendon*, without more, does not persuade us that the court properly exercised its discretion. Even at the time the trial court relied on *McClendon*, our Supreme Court already had cast serious doubt upon the viability of its holding in *McClendon* that jurors understood the factors that affect the unreliability of eyewitness identification. See *State* v. *Ledbetter*, 275 Conn. 534, 881 A.2d 290 (2005), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006); see also *State* v. *Marquez*, 291 Conn. 122, 967 A.2d 56, cert. denied, 558 U.S. 895, 130 S. Ct. 237, 175 L. Ed. 2d 163 (2009).

In *State* v. *Ledbetter*, supra, 275 Conn. 579, the court mandated that trial courts instruct juries about the risk of misidentification caused by certain out-of-court identification procedures. That decision was reached on the basis of the court's exhaustive review of scientific studies involving the risks of eyewitness identifications. See id., 569–74. If the court needed to review scientific studies in order to conclude that a jury instruction was needed to avoid the risks inherent to eyewitness identifications, this raised significant doubts about whether such risks necessarily were within the general understanding of jurors and, therefore, whether expert testimony properly should be precluded on that basis. As we have already discussed, the Supreme Court in *Arroyo*

similarly reviewed and found persuasive studies discussing the dangers of informant testimony, including work done by Natapoff, and, as it had done in *Ledbetter*, it mandated that courts should give an appropriate jury instruction.

Eventually, in *State* v. *Guilbert*, supra, 306 Conn. 253, our Supreme Court overruled *Kemp* and *McClendon*, and concluded that the trial court in *Guilbert* had abused its discretion by not allowing expert testimony. Indeed, it recognizing that although "[a]n expert should not be permitted to give an opinion about the credibility or accuracy of the eyewitness testimony itself [because] that determination is solely within the province of the jury . . . [an] expert should be permitted to testify . . . about factors that generally have an adverse effect on the reliability of eyewitness identifications and are relevant to the specific eyewitness identification at issue." Id., 248. The court also held that generalized jury instructions were not an adequate substitute for expert testimony. Id., 258.

It is undisputed that Natapoff's testimony demonstrated that she was qualified to testify as an expert about informant testimony. She had relevant information about factors a jury should consider when evaluating the credibility of an informant, information that was outside the knowledge of the average juror, as demonstrated by Natapoff's own testimony and the numerous studies and research she cited to the court and by our Supreme Court.[43] Because her testimony could have aided the jury in evaluating the credibility of the informants who testified on behalf of the state against the defendant, we are convinced that the court abused its discretion by granting the state's motion in limine to preclude Natapoff's testimony.

The judgment is reversed and the case is remanded for a new trial.

In this opinion SHELDON, J., concurred.

[1] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

[2] General Statutes (Rev. to 1995) § 53a-54b, as amended by Public Acts 1995, No. 95-16, § 4, provides in relevant part: "A person is guilty of a capital felony who is convicted of any of the following . . . (5) murder by a kidnapper of a kidnapped person during the course of the kidnapping or before such person is able to return or be returned to safety . . . (7) murder committed in the course of the commission of sexual assault in the first degree . . . or (9) murder of a person under sixteen years of age."

Hereafter, unless otherwise indicated, all references in this opinion to § 53a-54b are to General Statutes (Rev. to 1995) § 53a-54b, as amended by Public Acts 1995, No. 95-16, § 4.

[3] In accordance with our policy of protecting the interests of the victims of sexual abuse, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

[4] The defendant admitted to Allain that he choked A.P. to death and disposed of her corpse in a body of water.

[5] The defendant admitted to Douton that A.P. "was in the river" and that "they would never convict him because they would never find [her] body."

[6] The defendant admitted to Ching that he had raped and killed a girl on his boat. He also told Ching that he had hidden the body in a well before

dumping it in the Long Island Sound.

[7] The defendant admitted to Buckingham that he accidentally choked a young girl to death while having sex with her and that he then disposed of the body in the "Sound."

[8] Even though we conclude that the defendant is entitled to a new trial because of harmful evidentiary error, it is necessary to address first the defendant's sufficiency of the evidence claim. As our Supreme Court stated in *State* v. *Padua*, 273 Conn. 138, 179, 869 A.2d 192 (2005), "a reviewing court must address a defendant's insufficiency of the evidence claim, if the claim is properly briefed and the record is adequate for the court's review, because resolution of the claim may be dispositive of the case and a retrial may be a wasted endeavor." (Internal quotation marks omitted.) "[A] defendant is entitled to a judgment of acquittal and retrial is barred if an appellate court determines that the evidence is insufficient to support the conviction." (Internal quotation marks omitted.) *State* v. *Tenay*, 156 Conn. App. 792, 801–802, 114 A.3d 931 (2015).

[9] The defendant also did not request that the jury be instructed on the corpus delicti rule.

[10] We note that, in one isolated instance, a concurring and dissenting opinion, quoting a case from North Dakota, defines the corpus delicti rule in homicide cases as "consist[ing] of two component parts, the first of which is the death of the person alleged to have been killed, and the second that such death was produced through criminal agency." (Internal quotation marks omitted.) *State* v. *Courchesne*, 296 Conn. 622, 791 n.5, 998 A.2d 1 (2010) (*Zarella, J.*, concurring in part and dissenting in part).

[11] In *State* v. *DelVecchio*, 191 Conn. 412, 426, 464 A.2d 813 (1983), our Supreme Court later clarified that although it was not necessary for such corroborating evidence to be introduced into evidence prior to the defendant's confession, that "is ordinarily the better procedure."

[12] The defendant in *Hafford* was convicted of a capital felony for committing a murder in the course of the commission of a first degree sexual assault, felony murder, murder, robbery in the first degree, burglary in the first degree and sexual assault in the first degree. *State* v. *Hafford*, supra, 252 Conn. 276–77. The defendant's corpus delicti claim was directed at his sexual assault conviction.

[13] Although the state did not initially raise this question in its brief, the court raised the issue at oral argument and subsequently ordered the parties to file supplemental briefs addressing the issue.

[14] In at least one case decided since *Oliveras*, our Supreme Court noted that the defendant at trial had objected to the admission of certain incriminating statements on the ground that the state had failed to establish that the corpus delicti existed in Connecticut. See *State* v. *Beverly*, 224 Conn. 372, 374 n.3, 618 A.2d 1335 (1993). On appeal, however, the defendant did not pursue this evidentiary claim, but instead raised the corroboration rule as part of his challenge to the sufficiency of the evidence. The court entertained this claim without discussion of whether the corroboration rule is solely a rule of evidence or may be raised as an insufficiency of the evidence claim. Id., 374–75. Although the court in *Beverly* allowed the defendant to raise the corroboration rule in challenging the sufficiency of the evidence, the court also somewhat contradictorily stated: "The corpus delicti rule is a *rule of evidence* intended to protect an accused from conviction as a result of a baseless confession when no crime has in fact been committed." (Emphasis added.) Id., 375.

[15] *State* v. *Oliveras*, supra, 210 Conn. 751, was decided before our Supreme Court reformulated the corpus delicti rule in *State* v. *Hafford*, supra, 252 Conn. 314–18, by extending the *Opper* rule to all crimes, including homicides.

[16] The concurring opinion does not explain why we are not bound by the Supreme Court's decision in *Uretek, Inc.*, or by this court's decision in *Heredia*.

[17] Professor George E. Dix opines that the rule is best understood as a question of evidentiary sufficiency and recognizes that "[i]nsofar as the rule is one of evidentiary sufficiency, its nature suggests that the jury should at least play a role in its application." 1 K. Broun, McCormick on Evidence (7th Ed. 2013) § 145, p. 806. The treatise subsequently suggests, in a contradictory fashion, that the jury is ill-suited to play a role in considering whether the prosecution has introduced sufficient corroborating evidence. Id., p. 807.

[18] This process is akin to the procedure used by a trial court in considering, pursuant to a motion to suppress, whether a defendant's statements to law enforcement must be suppressed pursuant to constitutional guarantees because they were not voluntarily made. In those circumstances, the trial

court decides whether to admit such statements and, if admitted, the jurors are free to give the statements whatever weight they conclude is appropriate based on all relevant facts, including whether such statements were voluntarily made. See *Lego* v. *Twomey*, 404 U.S. 477, 483–86, 92 S. Ct. 619, 30 L. Ed. 2d 618 (1972).

[19] Certainly, it is possible that the corroboration rule could have constitutional implications if the legislature chose as a matter of state law to make its proof an express statutory requirement and, thus, an element of the crime. See *Mullaney* v. *Wilbur*, 421 U.S. 684, 95 S. Ct. 1881, 44 L. Ed. 2d 508 (1975). The legislature has not done so in Connecticut.

[20] The concurring opinion suggests that we have violated the rule that sufficiency of the evidence claims are reviewable without reference to *Golding*. See *State* v. *Adams*, 225 Conn. 270, 276 n.3, 623 A.2d 42 (1993) This suggestion misapprehends our analysis. We agree with the concurring opinion that the defendant is entitled to appellate review of the sufficiency of the evidence without reference to *Golding*, and we have afforded the defendant that review by considering all the evidence admitted, including his unobjected-to confessions. It is only the unpreserved, corpus delicti-based challenge to the *admission* of the defendant's confessions that we have found to be an unpreserved, nonconstitutional claim that is not reviewable under *Golding*. Under our standard of review, alleged errors in the admission of evidence play no legitimate role in our evaluation of sufficiency of the evidence claims. See *State* v. *Carey*, 228 Conn. 487, 496, 636 A.2d 840 (1994) ("[c]laims of evidentiary insufficiency in criminal cases are always addressed independently of claims of evidentiary error"); *State* v. *Smith*, 73 Conn. App. 173, 180, 807 A.2d 500 ("claim of insufficiency of the evidence must be tested by reviewing no less than, and no more than, the evidence introduced at trial"), cert. denied, 262 Conn. 923, 812 A.2d 865 (2002).

[21] The jury was free to interpret the defendant's statement that he wanted "to do her" either as an expression of his intent to have sexual intercourse with A.P. or as an expression of his intent to kill her. In either instance, when considered in light of the defendant's statement that he "need[ed] a body for the altar," the jury reasonably could have inferred that his ultimate plan was to kill A.P.

[22] We recognize that this prior misconduct evidence, standing alone, is insufficient to prove that the defendant committed the crimes with which he is charged. *State* v. *DeJesus*, supra, 288 Conn. 474 n.36. Such evidence, however, may be used by the jury, in conjunction with all of the other evidence, to conclude that the state proved the charges beyond a reasonable doubt.

[23] We note that the defendant's confession to Ching, in particular, had heightened trustworthiness because Ching was no longer in prison, on probation or parole, and had no charges pending against him at the time he related the defendant's confession to the police.

[24] The defendant cannot rely on the corroboration rule in challenging the sufficiency of the evidence regarding an intent to kill because, as previously discussed, (1) he waived the application of that rule by failing to object to the admission of the confessions, (2) his confessions were sufficiently corroborated pursuant to *Opper* v. *United States*, supra, 348 U.S. 93, and *State* v. *Hafford*, supra, 252 Conn. 316–17, and (3) the corpus delicti of the crime of murder relates solely to the death of the victim and not to whether the defendant had the requisite intent to kill.

[25] The jury could have reasonably concluded from Allain's eyewitness testimony that the sexual assault occurred in the defendant's truck in the presence of Allain, or on the defendant's boat, or at another location as described in the defendant's confession to Buckingham.

[26] The defendant's contention that his confessions are the only evidence that he murdered A.P. in the course of the commission of a sexual assault is incorrect. First, the defendant's sexual assault of K.S. was admitted as substantive evidence of his propensity to engage in the sexual assault of teenage girls. Second, the jury could also have concluded that, in addition to any sexual assault to which the defendant confessed, Allain witnessed the defendant sexually assault A.P. in his truck. With respect to that sexual assault, the defendant did not argue at trial, and does not argue in his principal brief on appeal, that the sexual assault that Allain testified that he witnessed is insufficient evidence because of any temporal incongruity between the predicate sexual assault and A.P.'s murder. Accordingly, we express no opinion regarding whether the murder was committed in the course of the commission of the sexual assault to which Allain was an eyewitness or a subsequent sexual assault as described in the defendant's

confessions.

[27] In his supplemental brief, the defendant does not rely on the corroboration rule with respect to this count except for the fact of A.P.'s death.

[28] The defendant also argues that, by excluding the evidence, the court violated his constitutional rights to due process, to confront witnesses, and to present a defense. Because we rule in favor of the defendant on the evidentiary ground raised, we do not consider the constitutional aspects of this claim. See *State* v. *Genotti*, 220 Conn. 796, 804, 601 A.2d 1013 (1992) (court should eschew reaching constitutional issues on appeal if claim disposed of on evidentiary grounds).

[29] Allain did ask Madden for guidance as to whether he needed a lawyer, but then let the matter drop.

[30] Although the videotape containing the pretest interview was never shown to the jury, it was reviewed by the trial court, along with the videotape of the polygraph examination, and marked for identification, thereby preserving it for appellate review.

[31] Our Supreme Court, in an opinion affirming the denial of a motion for sentence modification filed by one of the convicted perpetrators in the Measles case, noted the underlying facts as follows: "[P]ersons kidnapped the thirteen year old victim, [Measles], then brought her to a remote location where she was terrorized, beaten, gang-raped and murdered. Members of the group then rolled the victim's body in a tarp, wrapped it in chains, and dumped the victim's body in the Housatonic River." *State* v. *Dupas*, 291 Conn. 778, 786 n.8, 970 A.2d 102 (2009).

[32] The defendant's trial counsel conceded that there was "nothing in the tape that suggests that [Madden] had the condignation, approval, or support of the state's attorney's office, but I don't think that's necessary for the purposes for which I offer it."

[33] After the court's clarification that it was not prohibiting the defendant from asking Allain questions concerning assurances made to him during the pretest interview, the following colloquy occurred:

"[Defense Counsel]: The use of the tape then?

"The Court: Well, I would think that the tape itself would not—that's even a separate issue as to whether or not you could use that; that would be extrinsic evidence of something.

"[Defense Counsel]: I don't think it's extrinsic evidence at all. It's his conduct during an interview and his response to questions during the interview.

"The Court: Well—

"[Defense Counsel]: It's much like asking—using a deposition transcript of a prior proceeding where a question is answered and the lawyer or the declarant says he understand it.

"The Court: And we're not there yet, in the court's view.

"[Defense Counsel]: I gather, constructively—and I just want to round the record out—that as to the B claim—that is, the claim that we can use the polygraph results to show the present influence on the declarant, that is, his knowledge that the police regard him as having failed and therefore his motive for telling him [w]hat they want to hear today—I gather the court is ruling under *Porter*, as it understands it, that that is not permitted as well?

"The Court: Yes."

The state, in its principal appellate brief, references the court's statement, "we're not there yet," and indicates that the defense in fact questioned Allain on cross-examination about whether he was offered any assurances during the pretest interview. The state correctly notes that defense counsel made no further effort to introduce the videotape into evidence. To the extent that the state is suggesting either that the defendant waived his claim regarding the admissibility of the videotape, that he abandoned that claim, or that the trial court failed to issue a final ruling as to the admissibility of the videotape, we do not entertain those arguments because they are not expressly raised or briefed by the state, and the state addresses the evidentiary claim on its merits. See *State* v. *Luis F.*, 85 Conn. App. 264, 271 n.1, 856 A.2d 522 (2004).

[34] See *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

[35] Even the state, in seeking to preclude the admission of the pretest videotape, did not contend that any mention of the term polygraph was impermissible.

[36] We note that the prohibition against the admission of "willingness" evidence is designed to avoid using such willingness as a basis for finding a witness credible. Other uses, for example, to establish a particular motiva-

tion to take advantage of a deal offered by the state, may not necessarily warrant similar exclusion.

[37] Although the defendant did raise constitutional challenges, we resolve this claim on evidentiary grounds; see footnote 8 of this opinion; and thus properly place the burden on the defendant to prove harmful error.

[38] In conjunction with his prior misconduct claim, the defendant also contends that the court improperly instructed the jury as to the proper use of the challenged evidence. The state responds that the defendant implicitly waived any claim of instructional error at trial and, thus, the claim is unreviewable on appeal. According to the state, after the court provided him with an opportunity to review the written jury charge, the defendant did not object and failed to raise the issue that he now asserts on appeal. See *State* v. *Kitchens*, 299 Conn. 447, 482–83, 10 A.3d 942 (2011). Having concluded that the defendant is entitled to a new trial, we conclude that it is unnecessary to address the defendant's claim of instructional error.

[39] Again, because we rule in favor of the defendant on an evidentiary basis, we do not reach the constitutional aspects of his claim. See footnote 28 of this opinion.

[40] See, e.g., A. Natapoff, Snitching: Criminal Informants and the Erosion of American Justice (New York University Press 2009); A. Natapoff, comment, "Beyond Unreliable: How Snitches Contribute to Wrongful Convictions," 37 Golden Gate U. L. Rev. 107 (2006). The state never argued before the trial court nor does it claim on appeal that Natapoff does not qualify as an expert concerning the reliability of informant testimony on the basis of her knowledge, experience and training. In fact, the state acknowledges that our Supreme Court, in *Arroyo*, cited favorably to Natapoff's writings on this subject. See *State* v. *Arroyo*, supra, 292 Conn. 568 n.8. It should be further noted that the trial court did not preclude Natapoff's testimony on the ground that she did not qualify as an expert. Because Natapoff's credentials as an expert are not at issue, we do not set forth her qualifications in detail here.

[41] The court's instruction regarding informant testimony was, in total, as follows: "Witnesses testified in this case as informants. An informant is someone who has information regarding the crime and agrees to testify in exchange for some benefit from the state. In evaluating an informant's testimony, you should consider the benefits that the state has promised the informant in exchange for his cooperation.

"It may be that you would not believe a person who is receiving benefits in exchange for testimony as well as you might believe other witnesses. An informant may have such an interest in the outcome of this case that his testimony may have been colored by that fact.

"Therefore, you must look with particular care at the testimony of an informant and scrutinize it very carefully before you accept it. You should determine the credibility of that witness in the light of any motive for testifying falsely and inculpating the accused.

"If you find that the witness is an informant who has been promised a reduction in his sentence or other valuable consideration by the state in return for his testimony, or who hopes for or expects consideration by the state in return for his testimony, you must decide whether you will believe or disbelieve the testimony of a person who is testifying in exchange for some benefit from the state. Like all other questions of credibility, this is a question you must decide based on all the evidence presented to you."

[42] The type of expert testimony at issue here does not involve the scientific evidence at issue in *Kemp* and *McClendon*. Perhaps a more appropriate analogy would be to child sex abuse cases in which the victim has been impeached concerning inconsistencies or recantations and expert testimony is thereafter permitted to explain, in general terms, the types of behavioral characteristics to be expected when a child discloses instances of sexual abuse. See *State* v. *Vumback*, 68 Conn. App. 313, 327–32, 791 A.2d 569 (2002), aff'd, 263 Conn. 215, 819 A.2d 250 (2003).

[43] This opinion should not be read as suggesting that expert testimony must be permitted in all criminal cases in which a jailhouse informant testifies. Rather, in order to admit the testimony of an expert regarding the reliability of informant testimony, the defendant bears the burden of establishing that the testimony the expert will provide is relevant and sufficiently tailored to the circumstances surrounding the particular informant. See Conn. Code Evid. § 7-2 (requiring that expert testimony "assist the trier of fact in understanding the evidence or in determining a fact in issue"); *Kairon* v. *Burnham*, 120 Conn. App. 291, 296–97, 991 A.2d 675 (proper to exclude expert testimony not relevant to facts at issue), cert. denied, 297

Conn. 906, 995 A.2d 634 (2010). This additional "fit" requirement was met in the present case because the defense established during its proffer that many of the circumstances identified by Natapoff as affecting the reliability of jailhouse informants existed with respect to the informants who testified against the defendant.